STATE OF MINNESOTA *ex rel.* Railroad & Warehouse Commission *vs.* CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY.

## April 20, 1888.

**Regulation of Railway Tariffs—Conclusiveness of Commission's Tariffs.**—Under Laws 1887, c. 10, § 8, the determination of the railroad and warehouse commission as to what are equal and reasonable fares and rates for the transportation of persons and property by a railway company is conclusive, and, in proceedings by *mandamus* to compel compliance with the tariff of rates recommended and published by them, no issue can be raised or inquiry had on that question.

**Same—Constitution—Delegation of Power to Commission.**—The authority thus given to the commission to determine, in the exercise of their discretion and judgment, what are equal and reasonable rates, is not a delegation of legislative power.

**Same—Mandamus—Jurisdiction of Supreme Court.**—Section 8, referred to, vests the supreme court (concurrently with a district court) with original jurisdiction of all proceedings by *mandamus* therein provided for to compel compliance with the provisions of the act.

Original proceeding by *mandamus,* to compel the respondent to obey an order of the railroad and warehouse commission in regard to its milk rates between Faribault and Owatonna and St. Paul and Minneapolis. The information and the alternative writ, after setting out the organization of the commission, the appointment and

qualification of the commissioners and their secretary, and the authority given the commission by Laws 1887, c. 10, to compel common carriers to adopt such rates as the commission shall declare equal and reasonable, and the provision in the act subjecting any common carrier, in case of neglect to comply with the rates fixed by the commission, to a writ of *mandamus* to be issued by any judge of this court on application of the commission, proceed substantially as follows:   Respondent is a Wisconsin corporation, and a common carrier by rail from Owatonna, Faribault, Dundas, Northfield and Farmington, to the cities of St. Paul and Minneapolis, all in this state, and owns and operates a line of railway extending from Calmar, in Iowa, to Leroy in this state, and thence, through Owatonna and Faribault, and the other points named, to St. Paul and Minneapolis, and known as the Iowa and Minnesota division of its railway. It holds its right of way under the provisions of section 4, article 10, of the constitution of the state, and is bound to carry the mineral, agricultural, and other products or manufactures on equal and reasonable terms.

On the 22d of June, 1887, the Board of Trades Union of Farmington, Northfield, Faribault and Owatonna, an association composed of the boards of trade of those places, filed with the commission a petition in writing, complaining, among other things, that the respondent, being such common carrier as before stated, charges for transportation of milk to St. Paul and Minneapolis four cents per gallon from Owatonna, and three cents per gallon from Faribault, Dundas, Northfield and Farmington, and that such charges are unreasonably high, and subject the traffic in milk between those points to unreasonable prejudice and disadvantage, and praying that such rates be declared unreasonable, and that respondent be compelled to change them and adopt such rates as the commission shall declare to be equal and reasonable.   A copy of the petition is annexed to and made a part of the information and writ.   On filing the petition, a statement of the charges which were made was, on June 29, 1887, sent by the commission to the respondent, and on July 6, 1887, the respondent was called on by the commission to satisfy the complaint or answer it in writing at the office of the commission in the capitol

at St. Paul, on July 13, 1887. The respondent did not satisfy the complaint within the time specified, but filed with the commission its written answer, a copy of which is attached to the information and writ, stating that its rates were unreasonably low; that 25 per cent. more for the same commodity is charged into New York for equal distances and one hundred times larger volume in favor of New York; that the rate of one-tenth per cent. per gallon on milk handled on passenger trains one mile is not unreasonable, is not first class rates by freight train, and was made low to encourage the trade, under the hope and promise that when the trade was fostered it would be advanced. At the time and place appointed for hearing the petition, the petitioner and the respondent both appeared, and the commission proceeded to investigate the complaint, and upon such investigation the commission found that the respondent's charges for transporting milk over its Iowa & Minnesota division from Owatonna and Faribault to St. Paul and Minneapolis were 3 cents per gallon in ten-gallon cans, and that such rates were unequal and unreasonable, and found that the company's tariff of rates for such transportation, filed and published by respondent as provided by Laws 1887, *c.* 10, was unequal and unreasonable; and the commission declared that a rate of $2\frac{1}{2}$ cents per gallon in ten-gallon cans was and is an equal and reasonable rate for the service. After completing its investigation, the commission, on August 4, 1887, made a report in writing, which included the findings of fact on which it based its conclusion, together with its recommendation as to what tariff should be substituted for the tariff which it had found unequal and unreasonable, and also a specification of the rates which the commission declared to be equal and reasonable. A copy of the report is annexed to the information and writ; it is addressed to the respondent, and is as follows:

## "STATE OF MINNESOTA.

"Office of Board of Railroad and Warehouse Commissioners, }
        "St. Paul, August 4, 1887. }

"*To the Chicago, Milwaukee & St. Paul Railway Company:*

"*Gentlemen:* It appearing from your schedule of rates and charges for the transportation of milk over and upon the Iowa & Minnesota

division of your road, that you charge, collect, and receive for the transportation of milk over and upon said line, from Owatonna and Faribault to the cities of St. Paul and Minneapolis, three cents per gallon in ten-gallon cans, and from Dundas, Northfield, and Farmington to said cities of St. Paul and Minneapolis, two and one-half cents per gallon, in cans of like capacity; and complaint having been made that such rates and charges are unequal and unreasonable, and that the services performed by you in such transportation are not reasonably worth the said sums charged therefor; and this commission having thereupon, pursuant to the provisions of section eight of an act entitled 'An Act to regulate common carriers, and creating the Railroad and Warehouse Commission of the State of Minnesota, and defining the duties of such commission in relation to common carriers,' approved March 7, 1887, examined the cause and reasonableness or said complaint, and finding, pursuant to subdivision (e) of said section, that your said tariff of rates, so far as appertains to the transportation of milk to the cities of St. Paul and Minneapolis from the other places above named, and in so much as said tariff provides for or requires the charging or collection of a greater compensation than two and one-half cents per gallon, is unreasonable and excessive:

"Therefore said commission recommends and directs that you, the said Chicago, Milwaukee & St. Paul Railway Company, shall alter and change your said schedule by the adoption and substitution of a rate not to exceed two and one-half cents per gallon for the services aforesaid, from the cities of Owatonna and Faribault, or either of them, to said St. Paul and Minneapolis.

"The commission, as at present advised, approves of the custom and arrangement which, it is informed, has been adopted and is now in use by the Minnesota & Northwestern R. R. Co., of collecting two and one-half cents per gallon on all milk transported by it, regardless of distance; but this expression of opinion is no part of the decision, notice, or order in this case.

"By order of the Railroad and Warehouse Commission,

"E. S. WARNER, Secretary."

The report was entered of record by the commission, and a copy furnished to the complainants and to the respondent, with a notice to respondent to desist from charging or receiving such unequal or unreasonable rates. The respondent for more than ten days after such notice neglected to substitute for its tariff that recommended by the commission, whereupon the commission made, published, and posted at all the stations of respondent's line in this state, prior to

November 12, 1887, the tariff recommended by it, of which the following is a copy:

"CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY,.

"(IOWA & MINNESOTA DIVISION.)

"FREIGHT TARIFF ON MILK FROM OWATONNA AND FARIBAULT TO ST. PAUL AND MINNEAPOLIS,

"TAKING EFFECT OCTOBER 15, 1887.

"STATE OF MINNESOTA,     }
"OFFICE of RAILROAD AND WAREHOUSE COMMISSION,    }
"ST. PAUL, October 13, 1887.    }

"Whereas, at a regular meeting of the Railroad and Warehouse Commission of the State of Minnesota, held at the office of said commission in the city of St. Paul, on the 4th day of August last, and pursuant to section eight (8) of chapter ten (10) of the General Laws of said State, passed and enacted at the 25th session of the Legislature thereof, A. D. 1887, a notice or order was made and issued by said commission, and duly served upon said company, of which the following is a copy namely:"

(Here follows a copy of the report and notice to respondent already set forth.)

"And whereas said railway company have, for more than ten days since the service of said order upon them as aforesaid, neglected and refused to substitute such tariff of rates, or to adopt such rate and charge, as in and by said notice and order said company was recommended and directed to do, and do still so neglect and refuse:

"*Now therefore we, the said Commission, do hereby publish and declare the said tariff of rates and the said charges for such transportation, namely: Two and one-half cents per gallon, in ten (10) gallon cans, from either* the Owatonna *station or the* Faribault *station, on* said road, *to either the city of* St. Paul *or* Minneapolis *as, and to be,.* the legal, equal, and reasonable maximum charge and compensation for such service, and that the same is now in force and effect, in lieu and place of the charges and compensation heretofore demanded and received therefor by said railway company.

"By order of the Railroad and Warehouse Commission,
   (Seal)                 "E. S. WARNER, Secretary."

The respondent neglects and refuses to carry out the recommendation so made, published, and posted by the commission, and continues to charge three cents per gallon for the transportation of milk in ten-gallon cans from Owatonna and Faribault to St. Paul and Min-

neapolis. The information and writ further aver that this charge is unequal, unreasonable, and excessive, and that two and one-half cents per gallon is the maximum reasonable charge for such service, and that any rate above that is unequal, unreasonable, and excessive, and that three cents a gallon in ten-gallon cans is a higher rate than is charged for the same distances on passenger trains by any express company, or by any other railroad company in the state engaged in transporting milk to St. Paul or Minneapolis, the highest rate charged by any company for like distances on passenger trains being two and one-half cents per gallon in ten-gallon cans. That the milk transported by respondent over its Iowa & Minnesota division to St. Paul and Minneapolis, large quantities of which are shipped from Faribault, is transported on a passenger train which runs daily from Owatonna to St. Paul and Minneapolis; and that the respondent, by means of such excessive charges, subjects the traffic in milk at Faribault and Owatonna to undue and unreasonable prejudice and disadvantage, and there is no plain, speedy, or adequate remedy in the ordinary course of law. The command of the alternative writ, as prayed for and issued, is that the respondent immediately comply with the recommendation and order of the commission of August 4, 1887, and change its tariff to conform to the tariff of the commission, and adopt, in lieu of its former charges for transporting milk from Owatonna and Faribault to St. Paul and Minneapolis, the rates declared by the commission in its tariff to be equal and reasonable, to wit, two and one-half cents per gallon in ten-gallon cans from either Owatonna or Faribault to either St. Paul or Minneapolis, or show cause, etc.

The respondent, in its answer, states the constitutional provisions dividing the powers of the government between the legislative, executive, and judicial departments, vesting legislative powers in the senate and house of representatives, and forbidding the exercise of the powers delegated to one department by the persons belonging to or constituting any other department, and avers that so far as the power to make rates for transportation pertains to the state, it is vested exclusively in the legislature, and cannot be delegated to any other department or any person or commission; and that the act of March

7, 1887, (Laws 1887, *c.* 10,) in so far as it attempts to confer on the commission the power to fix rates for carriage of freight and passengers, is unconstitutional and void, and that the order of the commission of October 13, 1887, is unauthorized, and unconstitutional and void. The answer further avers that the respondent is the absolute owner of its railway in its own right, together with all its franchises, equipment, and appurtenances, and is entitled to the possession and beneficial use thereof, and as a consequence has the right to make, fix, and establish the rates for transportation of freight and passengers over its railway, subject only to the provision that such rates shall be fair and reasonable. That the establishment of such rates by the state, through such board or otherwise, against respondent's will, is *pro tanto* a taking of its property and depriving it thereof without due process of law, in violation of section 1, of article 14, of the constitution of the United States; and that the commission's order of October 13, 1887, was such a *pro tanto* taking and deprivation, and was therefore void and of no effect. The answer further avers that the rate of three cents per gallon in ten-gallon cans for transporting milk on passenger trains from Owatonna and Faribault to St. Paul and Minneapolis was reasonable, fair, and just, but that the commission, assuming the right to do so, fixed the rate at two and one-half cents a gallon instead of respondent's rate, which rate so fixed by the commission was not and is not a reasonable, fair, or just compensation to respondent for the services rendered; and the establishment of it, against respondent's will, was and is a *pro tanto* taking of respondent's property, and a deprivation of respondent thereof, without due process of law, in violation of section 1, of article 14, of the constitution of the United States; and that the order of October 13, 1887, fixing such rate, was therefore void and of no effect. The answer further avers that Owatonna is distant 71 miles, Faribault 56 miles, Northfield 43 miles, and Farmington 30 miles from Minneapolis, and the distance from each of these places to St. Paul is about three miles less than to Minneapolis; that on October 13, 1887, no other towns on respondent's Iowa & Minnesota division were engaged in shipping milk to St. Paul and Minneapolis; that the amount shipped from those towns was not sufficient to warrant respondent in running a

milk train or even a separate milk car, and that the milk so shipped was carried on a passenger train running over thirty miles an hour, and there was no other train on which it could be carried; that respondent's rates for transportation from these towns to either St. Paul or Minneapolis were two and one-half cents per gallon in ten-gallon cans from Farmington and Northfield, and three cents per gallon in like cans from Faribault and Owatonna, and that these rates were equal and reasonable, and the services performed therefor were reasonably worth the sums charged, and no person engaged in shipping or receiving milk complained that the rates were unequal, unjust, or unreasonable to the knowledge of respondent; but that a certain pretended organization, calling itself the Boards of Trade Union of Farmington, Northfield, Faribault, and Owatonna, filed a complaint before the commission, setting forth that respondent's charges were unequal and unreasonable, and falsely alleging that it charged four cents per gallon for transportation of milk from Owatonna to St. Paul and Minneapolis, and three cents per gallon for transporting it from Faribault, Dundas, Northfield, and Farmington, and praying that the respondent's rates be declared unreasonable, and that it be compelled to change them and adopt such rates as the commission should declare to be equal and reasonable; that the commission, after a pretended examination of the rates, assumed to find that the rate of three cents per gallon in ten-gallon cans from Owatonna and Faribault to St. Paul and Minneapolis was unequal and unreasonable, and declared that a rate of two and one-half cents per gallon in ten-gallon cans was equal and reasonable; but that the rate of two and one-half cents per gallon in ten-gallon cans is not an equal or reasonable rate; and it would not be equal, reasonable, or just in such cases to wholly ignore distance, and charge two and one-half cents per gallon in ten-gallon cans for the transportation of milk from any and all points, regardless of distance; and that to charge, regardless of distance, for transporting any kind of freight on a passenger train, would not be equal, reasonable, or just, or in accordance with sound and correct principles of railroading. The answer further alleges that it was the manifest intention of the commission, in fixing a uniform rate of two and one-half cents per gallon for transporting milk from Owatonna

and Faribault, to compel the respondent to carry milk at that rate to St. Paul and Minneapolis from any and all points in the state, regardless of distance, thereby eliminating the factor of distance in the computation of rates, which action is in violation of subdivision B of section 2 of the act of March 7, 1887, (Laws 1887, *c.* 10,) which provides that "it shall be unlawful for any common carrier subject to the provisions of this act to make or give any unequal or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatever, or to subject any particular person, company, firm, or corporation, or locality, or any particular description of traffic, to any unequal or unreasonable prejudice or disadvantage in any respect whatsoever." That the establishment of such uniform rate, regardless of distance, would be a discrimination in favor of Owatonna against Farmington, for the reason that Owatonna is more than twice as far from St. Paul as Farmington; and the establishment of such a principle in fixing the rate for carrying milk on passenger trains, regardless of distance, would not only be a violation of all correct principles of railroading and freight traffic, but in contravention of the law creating the commission.

After filing the answer the respondent moved for a reference to take testimony on the issues of fact raised by it, which motion was denied. The relator moved that a peremptory writ issue.

*Moses E. Clapp,* Attorney General, *A. D. Keyes,* and *J. M. Burlingame,* for relator.

*John W. Cary,* for respondent.

The court has not jurisdiction to hear and determine a writ of *mandamus,* the act of March 7, 1887, in section 8, providing merely that a judge of this court may allow the writ, which will then issue from, and be heard and determined by, the district court; and for the further reason that Laws 1881, *c.* 40, expressly gives a jury trial in all cases of *mandamus,* and the constitution, art. 6, § 2, forbids such a trial in this court.

Section 8 (e) and (f), under which this proceeding is brought, as it does not permit a hearing or defence of any kind, is unconstitutional, because conferring on the commission the power of making laws

which are binding, not only on the carrier, but on this court and all departments of the government. The act, (§ 2,) in providing that the common carrier's charges "shall be equal and reasonable," is a mere re-enactment of the existing law, leaving the question of whether the compensation charged is reasonable, as a judicial question, to the courts. If this law has been changed in regard to the transportation of milk from Owatonna and Faribault, provided it is transported over respondent's railway, so that it now reads, *not* that the rate shall be equal and reasonable, but that it shall be 2½ cents per gallon in ten-gallon cans—no more and no less,—the change has been made not by the legislature, but by the commission; and the new law, which the court is asked to enforce, is found not in the statute book, but in the decree of the relator. If a peremptory writ must issue in this case, it is only because that decree is the law of the case—has all the force of a statute. Any such delegation of the law-making power to the relator is wholly void. Const. art. 3, § 1; art. 4, § 1; *Barto* v. *Himrod*, 8 N. Y. 483; Cooley, Const. Lim. 116, and note; *Geebrick* v. *State*, 5 Iowa, 491; *Rice* v. *Foster*, 4 Harr. (Del.) 479; *State* v. *Young*, 29 Minn. 474; *State* v. *Simons*, 32 Minn. 540. Regarded as a law, the decree of the commission is partial and unequal in its operation and is void for that reason also. It applies only to the respondent, and not to the lines of other companies between Owatonna. and Faribault and St. Paul and Minneapolis.

The relator alleges that respondent's charges are unequal and unreasonable. This is expressly denied. Hence the record as it stands shows that respondent's rates were equal and reasonable, and that fixed by the relator unequal and unreasonable; and the court is asked to adjudge that respondent shall perform its service for an unequal and unreasonable compensation, which the act in question expressly prohibits.

Upon the true construction of the act, the commission is a body empowered to investigate and to recommend action by the railway companies; and its findings of fact in these investigations are to be taken as *prima facie* evidence of the facts found; but the commission has no power to enforce its recommendations except through the courts, where their justice, reasonableness and legality can then be

tested. This is expressly enacted in case of proceedings under sections 13 and 14, and the acts of the commission should be no more conclusive in proceedings under section 8 than in proceedings under sections 13 and 14. Hence, the respondent should be allowed to controvert by evidence the findings of the relator and the averments of the writ which are denied in the answer.

And unless the findings and order of the commission are merely advisory and their rates merely *prima facie* reasonable and just, with a right in respondent to controvert their reasonableness in the courts—if the order of the commission is absolute, and can neither be questioned by respondent nor reviewed by the courts—then such order deprives respondent of its property without due process of law. And an act which assumes to set up a commission, whose findings and decrees are infallible or above the power of the court to investigate or review, is not within the powers of the legislature.

MITCHELL, J. The questions here presented are—*First*, the construction, and, *second*, the constitutionality, of chapter 10, (particularly subdivisions *e, f,* and *g* of section 8,) Laws 1887, entitled "An act to regulate common carriers, and creating the railroad and warehouse commission of the state of Minnesota, and defining the duties of such commission in relation to common carriers." The provisions of the act are made applicable to all common carriers of persons or property by railroad, or partly by railroad and partly by water, when both are used under a common control or management. It creates and establishes a commission, to be known as the "Railroad and Warehouse Commission of the State of Minnesota," and to consist of three commissioners appointed by the governor, by and with the advice and consent of the senate. It provides that all charges by any common carrier for the transportation of passengers and property shall be equal and reasonable. It also requires all carriers to furnish ample, equal, and reasonable facilities for trade and travel; prohibits unequal and unreasonable preferences to any particular person or locality, or to any particular description of traffic; and forbids pools, rebates, or limitations of the common-law liability of carriers of property, etc. Section 8 (*a*) requires every common carrier to print and keep posted at every depot or station, schedules

showing its freight rates and passenger fares. (*b*) Forbids any change in these schedules without 10 days' notice. (*c*) Makes it unlawful to charge any greater or less rates than those specified in such schedules. (*d*) Requires the carrier to file with the railway and warehouse commission copies of these schedules, and to promptly notify such commission of all changes therein. (*e*) "That in case the commission shall at any time find that any part of the tariffs of rates, fares, charges, or classifications, so filed and published as hereinbefore provided, are in any respect unequal or unreasonable, it shall have the power, and is hereby authorized and directed, to compel any common carrier to change the same, and adopt such rate, fare, charge, or classification as said commission shall declare to be reasonable and equal; to which end the commission shall, in writing, inform such common carrier in what respect such tariff of rates, fares, charges, or classifications are unequal and unreasonable, and shall recommend what tariffs shall be substituted therefor." (*f*) "In case such common carrier shall neglect or refuse, for 10 days after such notice, to substitute such tariff of rates, fares, charges, or classifications, or to adopt the same as recommended by the commission, it shall be the duty of said commission to immediately publish such tariff of rates, fares, charges, and classifications as they had declared to be equal and reasonable, and cause the same to be posted at all the regular stations on the line of such common carrier in this state; and thereafter it shall be unlawful for such common carrier to charge or maintain a higher or lower rate, fare, charge, or classification than that so fixed and published by said commission." (*g*) "If any common carrier, subject to the provisions of this act, shall neglect or refuse to publish or file its schedules of classifications, rates, fares, or charges, or any part thereof, as provided in this section, or if any common carrier shall refuse or neglect to carry out such recommendation made and published by said commission, such common carrier shall be subject to a writ of *mandamus*, to be issued by any judge of the supreme court, or of any of the district courts, of this state, upon application of the commission, to compel compliance with the requirements of this section, and with the recommendation of the commission; and failure to comply with the requirements of said writ of

*mandamus* shall be punishable as and for contempt. And the said commission, as complainants, may also apply to any such judge for a writ of injunction against such common carrier from receiving or transporting property or passengers within this state until such common carrier shall have complied with the requirements of this section and the recommendation of said commission; and for any wilful violation or failure to comply with such requirements, or such recommendation of said commission, the court may award such costs, including counsel fees, by way of penalty, on the return of said writs, and after due deliberation thereon, as may be just."

1. In construing this act, the first question that presents itself is as to our own jurisdiction. As the law stood at the time of the passage of the act, the district court had exclusive original jurisdiction in all cases of *mandamus,* except when the writ is to be directed to a district court, or a judge thereof in his official capacity, in which case the supreme court had exclusive original jurisdiction; and all issues of fact in any *mandamus* proceeding were triable in the district court by a jury, as in an ordinary civil action. Gen. St. 1878, *c.* 80, § 12, Laws 1881, *c.* 40; *State* v. *Burr,* 28 Minn. 40, (8 N. W. Rep. 899;) *State* v. *Whitcomb,* 28 Minn. 50, (8 N. W. Rep. 902.) Does subdivision *g* of section 8, above cited, vest the supreme court with original jurisdiction of the proceedings in *mandamus* therein provided for, to compel compliance with the requirements of the act?

It must be admitted that the language of the act is vague, and its meaning obscure. The framer of the bill evidently was not sufficiently familiar with the practice in *mandamus* to express himself in apt terms. If the language was to be construed with technical strictness, it might be difficult to give to it any effect whatever. But legislative enactments are not to be defeated on account of mistakes, omissions, or inaccuracies of language, any more than other writings, provided the intention of the legislature can be ascertained from the whole act. In construing a statute, we must assume, if its language will admit, that the legislature intended to act within its constitutional power. We must also, if possible, so construe the language as to make it effectual. To construe this act as meaning that the judge shall, as a mere ministerial officer, issue the writ, without any

hearing or judicial determination by the court, as a sort of execution to enforce the orders of the commission, would be to hold the act unconstitutional. For, in such a case, the functions required of the judge would be only executive or ministerial, not judicial, or pertaining to the exercise by his court of its judicial powers. Of course, it is not in the power of the legislature to impose any such duties upon him. This construction must therefore be rejected. If it means that a *judge* of the supreme court is not only to allow the alternative writ, but to hear and determine whether a peremptory writ shall issue, (in which case he would act as a court,) it would be also unconstitutional. The supreme court consists of five judges, and can exercise its judicial functions only when a quorum is present. Again, if the act means that the judge of the supreme court shall issue the writ, and make it returnable in the district court, which alone should have jurisdiction to hear and determine the proceedings, it would be obnoxious to the objection that it would vest in him powers, and impose on him duties, belonging to the judges of the district court. Moreover, such a practice, even if allowable, would be at once both useless and without precedent. The only remaining interpretation that can be suggested, and the only one that will make the language of the act effectual, is that a judge of the supreme court or of the district court may issue (or cause to be issued) the writ, returnable into his own court, to bring the matter before it for hearing and determination; in short, that the intention of the act was to give the district and supreme court concurrent original jurisdiction of all proceedings in *mandamus* provided for in subdivision *g* of section 8 of the act to compel compliance with its provisions. This construction is supported and strengthened by the last clause of the section, which provides that "for any wilful violation or failure to comply with such requirements or such recommendations of said commission, the court may award such costs, including counsel fees, by way of penalty, on the return of said writs, and after due deliberation thereon, as may be just." This last is, in our opinion, the only reasonable or permissible construction of the act. What the practice would be in case the respondent's return made an issue of fact, we need not now inquire. As will be seen hereafter, the law

neither contemplates nor permits any issue as to the equality or reasonableness of the rates recommended by the commission; and, aside from this, the respondent tenders no issue of fact. Its whole defence rests in questions of law. There was no fact for it to traverse except its violation of the law. If the statute is valid, it was bound to obey it; and, if it is not obeying it, there is no issue of fact to try.

2. The next and only remaining question that arises on the construction of the act is as to the nature and extent of the powers granted to the commission in the matter of fixing rates. It seems to us that, if language means anything, it is perfectly evident that the expressed intention of the legislature is that the rates recommended and published by the commission (assuming that they have proceeded in the manner pointed out by the act) should be not simply advisory, nor merely *prima facie* equal and reasonable, but final and conclusive as to what are lawful or equal and reasonable charges; that, in proceedings to compel compliance with the rates thus published, the law neither contemplates nor allows any issue to be made or inquiry had as to their equality and reasonableness in fact. Under the provisions of the act, the rates thus published are the only ones that are lawful, and therefore, in contemplation of law, the only ones that are equal and reasonable; and, hence, in proceedings like the present, there is, as said before, no fact to traverse except the violation of the law in refusing compliance with the recommendations of the commission. Indeed, the language of the act is so plain on that point that argument can add nothing to its force. It is significant, however, in this connection, that while the other portions of the act are mainly copied from the "Interstate Commerce Act," in which the interstate commerce commission is not given any authority to fix rates, (its action being merely advisory, and the provisions of the act being only enforceable by judicial proceedings, in which the reports and findings of the commission, in certain cases, are made merely *prima facie* evidence of the facts therein stated,) subdivisions *e* and *f* of section 8, and so much of subdivision *g* of the same section of our act as relates to compelling compliance with the schedules of rates recommended by the commission, are entirely new, not being found in the act of congress. The incorporation of this new matter must

have been for a purpose, and that purpose clearly was to clothe the commission with full power to determine, in each particular case, what were equal and reasonable rates, and to make their determination on that question final and conclusive. There are a number of other subjects, such as the management of railroads, affecting the convenience and safety of traffic and travel, damage resulting to individuals or localities from unjust discriminations or extortionate charges, which are the subjects of investigation by the commission, and their reports made by subsequent sections the basis of actions in court, in which the findings of the commission are merely *prima facie* evidence of the matters therein stated. But these in no way relate to the matter of fixing general schedules of rates, which is fully and exclusively provided for in section 8, which, upon that subject, is complete in itself. Indeed, if the action of the commission upon that matter is not conclusive, it amounts to nothing; for nowhere in the act is there anything making it. *prima facie* evidence of what is equal and reasonable, should a judicial investigation of that question be permitted. What might be the result if the commission failed to exercise an honest judgment, and it manifestly and palpably appeared that they had acted corruptly, we need not consider, for no such case is now before us.

3. This brings us to the question of the validity of the act—that is, the authority of the legislature to confer such powers upon this commission. That the legislature itself has the power to regulate railroad charges is now too well settled to require either argument or citation of authority. The history of the contest over this question is still fresh in the minds of all. Railways had become practically the public highway system of the country. The situation was anomalous, being the first instance in history where a public highway system was at the same time owned by private parties, and exclusively used by those who owned it. This condition of things, emphasized by the reckless railway management of 15 years ago, led to legislation assuming to regulate and limit railway charges for the transportation of persons and property. Entrenched behind the doctrine that a charter is a contract, the railroad companies denied the power of the legislatures to do this; claiming the right to charge what they

pleased for their services, subject only to the common-law rule that these charges should be in themselves reasonable; and this they claimed was a question for judicial, and not legislative, determination. The dispute was submitted to the arbitrament of the courts. The decisions in the so-called "*Granger Cases*," over 11 years ago, resulted in a complete victory for the right of legislative control. It was there held that railway companies, being incorporated as common carriers for hire, and given extraordinary powers and special rights and privileges, in order that they might better serve the public, were engaged in a public employment, affecting the public interest, and therefore, unless protected by their charters, were subject to legislative control as to their rates of fare and freight; that for protection against wrong, under the form of legislative regulation, they must rely entirely upon the good faith of the people, and the wisdom and impartiality of the legislature. See *Granger Cases*, 94 U. S. 113–187. The result was so different from the preconceived ideas of the railway companies that they were slow to realize the full import of these decisions, and sometimes reluctant to accept the situation. Judging from their argument, it would seem that even the eminent counsel for the respondent in this case are not yet fully reconciled to the result. But we know of no decision of any court, state or federal, in which the doctrine of the cases referred to has been modified, denied, or overruled, and it must now be accepted as a settled fundamental principle in American constitutional law. In fact, it was settled in the only way that any such question can be permanently settled, viz., in accordance with public policy and public necessity, for no modern civilized community could long endure that their public highway system should be in the uncontrolled, exclusive use of private owners. The only alternative was either governmental regulation or governmental ownership of the roads.

It is insisted, however, that while the legislature might authorize a commission to recommend rates, and might declare that the rates so recommended should be *prima facie* evidence of what is equal and reasonable, yet it is not within its power to set up a commission whose judgment or determination as to what is reasonable should be final and conclusive; that this is a judicial question, which can only

be determined by the courts; that the railway company has a right to controvert before a court the reasonableness of the rates fixed by the commission; that, if absolute power to fix rates be given such a body, it may be abused to the extent of practical confiscation, and depriving the companies of their property without due process of law. This argument is not a new one. It is the same that was advanced 15 years ago against the right of the legislature itself to regulate rates, and, if it is sound, it would apply with equal force to either case. The power might be abused by the legislature, as well as by a commission. But the liability of a power to abuse is no argument against its existence; and, should the legislature directly fix rates, the railway company would no more have its day in court, or a judicial determination of their reasonableness, than if fixed by a commission. This argument was met and fully answered in the decision of the *Granger Cases*, already referred to. Its fallacy consists in failing to distinguish a case like the present from one of mere private contract, in which the public has no interest. In the latter, the reasonableness of a charge for services must be judicially ascertained, because the legislature has no control over the contract; but a railway company, engaged as a common carrier, is engaged in a public employment, affecting a public interest. It has received special rights and privileges from the state, whereby it enjoys certain advantages over others. Submission to regulation of its compensation by the state, in the exercise of its police power, may be said to be an implied condition of the grant; and the state, in exercising this power, only determines the conditions upon which the grant shall be enjoyed. The controlling fact is the right to regulate at all. This being conceded, it is immaterial, so far as concerns the question now under consideration, whether the legislature fixes the rates directly, or does it indirectly through a commission.

This brings us to the only remaining question in the case. It is contended that the power to regulate rates,—if it exists at all,—is legislative; and therefore the act is' void, because it delegates legislative power to a commission. This is really the most important question in the case. The constitution of the state vests all legislative power in a legislature, consisting of a senate and house of represent-

atives. It is, of course, one of the settled maxims in constitutional law, that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body. Where the sovereign power of the state has located the authority it must remain. The department to whose judgment and wisdom this high prerogative has been intrusted cannot relieve itself of the responsibility by choosing other agencies, and substituting their judgment and wisdom for its own. As was said by this court in *State* v. *Young,* 29 Minn. 474, 551, 552, (9 N. W. Rep. 737:) "It is a principle not questioned that except where authorized by the constitution, as in respect to municipalities, the legislature cannot delegate legislative power,—cannot confer on any body or person the power to determine what shall be the law. The legislature only must determine what it shall be. * * * In enacting a law, the legislature must pass on two things: *First,* on its authority to make the enactment; *second,* on the expediency of the enactment. It cannot refer either of these questions to the decision of any one else." But it is also true that it is often difficult to discriminate, in particular cases, between what is properly legislative, and what is or may be executive or administrative, duty. The authority that makes the laws has large discretion in determining the means through which they shall be executed; and the performance of many duties, which they may provide for by law, they may refer to some ministerial officer, specially named for the duty. Cooley, Const. Lim. 114. It is not every grant of powers, involving the exercise of discretion and judgment, to executive or administrative officers, that amounts to a delegation of legislative power. The difference between the departments undoubtedly is that the legislative makes, the executive executes, and the judiciary construes, the law; but the maker of the law may commit something to the discretion of the other departments, and the precise boundary of this power is a subject of delicate and difficult inquiry, into which a court will not unnecessarily enter. *Wayman* v. *Southard,* 10 Wheat. 1, 46. The principle is repeatedly recognized by all courts that the legislature may authorize others to do things which it might properly, but cannot conveniently or advantageously, do itself. All laws are carried into execution by officers appointed for the purpose; some

with more, others with less, but all clothed with power sufficient for the efficient execution of the law. These powers often necessarily involve in a large degree the exercise of discretion and judgment, even to the extent of investigating and determining the facts, and acting upon and in accordance with the facts as thus found. In fact, this must be so, if the legislature is to be permitted effectually to exercise its constitutional powers. If this was not permissible, the wheels of government would often be blocked, and the sovereign state find itself helplessly entangled in the meshes of its own constitution. The statute books are full of legislation granting to officers large discretionary powers in the execution of laws, the validity of which has never been successfully assailed. We might mention as examples of this the grant of power to courts to adopt rules governing their own practice and process; the power given to boards for the control of public institutions to make contracts, fix prices, and adopt rules reasonably adapted to carry out the purposes of their creation. The power of taxation is legislative, but this does not require the legislature itself to assess the value of each man's property, or determine his share of the tax. The exercise of the police power in requiring persons who follow certain occupations to obtain a license is legislative; but nothing is more common than to delegate to certain officers or boards the power to ascertain and determine whether persons have the proper qualifications as to learning, skill, or moral character, and to grant or refuse a license according as they may find the facts to be. The difference between the power to say what the law shall be, and the power to adopt rules and regulations, or to investigate and determine the facts, in order to carry into effect a law already passed, is apparent. The true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and the conferring an authority or discretion to be exercised under and in pursuance of the law. *Cincinnati, etc. R. Co.* v. *Commrs. Clinton County,* 1 Ohio St. 77, 88.

It seems to us that the authority and discretion conferred upon this commission is of the latter kind. The legislature enacts that all freight rates and passenger fares should be just and reasonable. It had the undoubted power to fix these rates at whatever it deemed

equal and reasonable; but what are equal and reasonable rates is a. question depending upon an infinite and ever-changing variety of circumstances. What may be such on one road, or for one descrip-tion of traffic, may not be such on or for another. What are rea-sonable one month may not be so the next. For a popular legisla-ture that meets only once in two years, and then only for 60 days, to attempt to fix rates, would result only in the most ill-advised and haphazard action, productive of the greatest inconvenience and in-justice alike to the railways and the public. If such a power is to be exercised at all, it can only be satisfactorily done by a board or com-mission, constantly in session, whose time is exclusively given to the subject, and who, after investigation of the facts, can fix rates with reference to the peculiar circumstances of each road, and each par-ticular kind of business, and who can change or modify these rates. to suit the ever-varying conditions of traffic. If experience has proved anything in the so-called railroad problem, it is that mere abstract. laws against unequal or unreasonable railroad charges are of little or no avail; hence modern legislation has usually taken the form of creating boards of commissioners, intrusted with general supervision over railroads. Almost all efficient legislation on the subject is under such commissions, vested with discretionary administrative powers,. more or less extensive. Our legislature has gone a step further than most others, and vested our commission with full power to determine what rates are equal and reasonable in each particular case. Whether this was wise or not is not for us to say; but in doing so we cannot see that they have transcended their constitutional authority. They have not delegated to the commission any authority or discretion as. to what the law shall be,—which would not be allowable,—but have: merely conferred upon it an authority and discretion, to be exercised in the execution of the law, and under and in pursuance of it, which is entirely permissible. The legislature itself has passed upon the expediency of the law, and what it shall be. The commission is in-trusted with no authority or discretion upon these questions. It can neither make nor unmake a single provision of law. It is merely charged with the administration of the law, and with no other power. Whether the charges of a railway in any particular case are or are

not equal and reasonable is a fact left by the law for them to determine. If the commission find them unequal and unreasonable, and declare other rates to be equal and reasonable, the law itself declares the former unlawful, and allows the railway company to charge only the latter. / Authorities precisely in point on this question are few. We are referred to no case where the grant of such authority and discretion to a board or commission has been held invalid, as a delegation of legislative power; but, on the contrary, numerous cases can be found in which the validity of acts conferring similar powers has been sustained. *People* v. *Harper*, 91 Ill. 357; *Georgia R. Co.* v. *Smith*, 70 Ga. 694; *Tilley* v. *Savannah, etc., R. Co.*, 5 Fed. Rep. 641, 656. See, also, *State* v. *State Board of Medical Examiners*, 34 Minn. 387, (26 N. W. Rep. 123;) *Hildreth* v. *Crawford*, 65 Iowa, 339, (21 N. W. Rep. 667.)

Our opinion is that the act is not obnoxious to the objection made. Let the writ issue as prayed for.

NOTE. After the filing of the foregoing opinion, the respondent, by *Flandrau, Squires & Cutcheon*, petitioned for a reargument on the grounds—(1) That since the investigation and order of the commission were made, not of its own motion, but on complaint made to it, the case was not within the 8th section, but was governed by the 13th, 14th and 15th sections, and therefore the remedy to enforce obedience to the order of the commission must be administered by the district court, which is clothed by those sections with exclusive jurisdiction; and hence this court has no jurisdiction of this proceeding, and it should be dismissed. (2) That even if the case were within section 8, the order of the commission is void upon its face, because it does not fix a definite rate, as provided in section 8 (e), but requires the respondent to change its schedule by substituting "a rate of *not to exceed* two and one-half cents per gallon," etc., and the act confers no power to fix a maximum rate or a sliding scale. (3) That the court, in its opinion, misconstrued the "*Granger Cases,*" and did not consider the later decisions, in which those cases are explained and limited, viz., *Ruggles* v. *Illinois*, 108 U. S. 526, 531-2, 533; *Stone* v. *Farmers' Loan & Trust Co.*, 116 U. S. 307, 325, 328, 330-1; *Yick Wo* v. *Hopkins*, 118 U. S. 356.

On July 2, 1888, the petition was denied, and on July 23d a writ of error to remove the cause to the supreme court of the United States was applied for and allowed.—[REPORTER.