STATE OF MINNESOTA, *ex rel.* Railroad & Warehouse Commission, *vs.* MINNEAPOLIS EASTERN RAILWAY COMPANY.

January 31, 1889.

**Regulation of Railway Tariffs—Determination and Tariff of Commission Conclusive on the Courts.**

*Mandamus.* The information was filed, and the alternative writ issued thereon, January 8, 1889, returnable January 15, 1889. In the information, which was recited in the alternative writ, the relator, the State Railroad & Warehouse Commission, after setting forth its own organization and powers under Laws 1887, *c.* 10, proceeds: "That the Minneapolis Eastern Railway is, and during all

the times hereinafter mentioned has been, a railroad corporation duly created and organized as such, operating one or more lines of railway within the city of Minneapolis in the state of Minnesota, and is and has been during all said time a common carrier engaged in the transportation of freight and property by rail within the limits of the city of Minneapolis in the state of Minnesota, and more particularly has, during all said time, been engaged in the business of handling and switching cars over its line or lines of railroad within the limits of said city of Minneapolis. That said Minneapolis Eastern Railway Company, as such common carrier, enjoys the right to conduct its business within the state of Minnesota subject to the provision of section 4, of article 10, of the constitution of the state of Minnesota, and is bound to carry minerals, agricultural, and other productions or manufactures on equal and reasonable terms. That prior to the 7th day of July, 1887, the said Minneapolis Eastern Railway Company had and maintained in force a schedule of their tariff of rates within the said city of Minneapolis as follows: For handling and switching empty cars over its line of railways within the limits of the city of Minneapolis $1.25 per car; for handling and switching loaded cars over its lines of railway within the city of Minneapolis, $1.50 per car; and that prior thereto such schedule of rates had been published by said railroad company. That on the 7th day of July, 1887, said commission found that said schedule of rates above set forth more specifically was unequal and unreasonable, and that on said 7th day of July, 1887, said commission did inform said railway company in what respect such tariff of rates was unequal and unreasonable, and did then and there recommend what tariff should be substituted therefor. That such finding of the commission and recommendation was and is in the words and figures following, to wit:

"'STATE OF MINNESOTA,

"'OFFICE OF BOARD OF RAILROAD AND WAREHOUSE COMMISSIONERS.

"'ST. PAUL, AUG. 2, 1887.

"'Whereas, at a regular meeting of the railroad and warehouse commission of the state of Minnesota, held at the office of said

commission in the city of St. Paul in said state, on the 7th day of July last, and pursuant to sec. 8, of an act entitled "An act to regulate common carriers, and creating the railroad and warehouse commission of the state of Minnesota, and defining the duties of such commission in relation to common carriers," approved March 7, 1887, a notice or order was then and there made and issued by said commission and duly served upon you, of which the following is a copy, namely:

" 'Whereas, all railroad companies owning or operating terminal or switching facilities at or within the city of Minneapolis in said state, with the exception of the Chicago, Milwaukee & St. Paul Railway Company, pursuant to subdivision (d) of section 8 of an act entitled "An act to regulate common carriers, and creating the railroad and warehouse commission of the state of Minnesota, and defining the duties of such commission in relation to common carriers," approved March 7, 1887, have filed with this commission copies of their several schedules of rates and charges for switching cars on their respective tracks at and within said city; and whereas, it appears from said schedule that the rates and charges made by said companies vary from twenty-five cents per car for empty cars to two dollars per car for loaded cars; and whereas, said commission, after due and careful inquiry and consideration, do find that each and every charge in excess of one dollar per car for switching within the limits of said city of Minneapolis is unreasonable, and an excessive compensation for the service performed:

" 'Now, therefore, it is ordered and determined by this commission, pursuant to the authority in them vested by the aforesaid legislative act, that all such schedules be changed by striking therefrom all charges or rates in excess of one dollar per car for the switching or transfer thereof, and insert in room of the words or figures stricken out the word "one dollar," or the appropriate sign and figure therefor.

" 'It is the object and purpose of this order to establish one dollar as the maximum charge for the switching or transfer of any car at or within the limits of said city, without regard to distance or the kind of goods or merchandise with which the car so switched or transferred may be loaded.

" ' And whereas, by the subsequent action of said commission, of which said action you were duly notified by order of the commission, the said order or notice should not take effect or be considered to be of binding force upon you until the 15th day of said month; and whereas, you have neglected and refused for more than ten days after and since the 15th day of July last to substitute such tariff of rates or charges, or to adopt the same as recommended and directed by said commission, as in and by said notice and order you were recommended and required to do, and do still so neglect and refuse:

" ' Now, therefore, we, the said commission, do hereby publish and declare the said tariff of rates, namely, one dollar per car for the switching or transfer of any loaded car by you within the limits of the said city of Minneapolis, as and to be the equal and reasonable charge for such switching or transfer of cars by you, and that the same is now in force and effect in place of the charges and rate of compensation by you heretofore charged for such service.

" ' You, the said railway company, your agents and employes, will act accordingly or answer for a violation of the section and act to which reference is above made.

" ' By order of the Commission,

· (Seal)                          " ' E. S. WARNER, Secretary.'

"That said railway company, the respondent herein, did neglect and refuse for ten days after notice thereof to substitute such tariff of rates and to adopt the same as recommended by the commission, and that thereupon said commission did immediately duly post and publish such tariff of rates so by them declared to be equal and reasonable.   That said common carrier, the respondent herein, has at all times neglected and refused to carry out such recommendation so made, published, and posted by said commissioners aforesaid; that said common carrier still continues to charge and collect the rates herein first specified as the schedule tariff of rates for handling and switching cars over its line of railway within the limits of said city of Minneapolis, and that there is no plain, speedy, or adequate remedy in the ordinary course by law."

The respondent, in its answer, alleges its incorporation in 1878,

and admits that it is a common carrier, and proceeds in substance as follows: The total length of respondent's constructed tracks is about three and one-half miles, and they are wholly within the city of Minneapolis. The total cost of its railway and equipment is $253,148.11, made up of the following items:

| | |
|---|---:|
| Right of way and damage to buildings - - | $100,102.99 |
| Grading and surfacing - - - | 9,237.64 |
| Bridges, docking and trestle - - - | 64,706.94 |
| Ties, iron and steel, track-laying, crossings, switches, and side-tracks - - - | 29,020.67 |
| Buildings - - - - - | 2,252.70 |
| Incorporation, legal expenses, and engineering | 6,115.16 |
| Office furniture and track scales - - | 447.55 |
| 1 Locomotive engine and 1 hand-car - - | 6,154.77 |
| Divers other items - - - - | 35,109.69 |

Since the acquisition of this right of way, the value of real estate in Minneapolis, as well adjacent to this railway as in the city at large, has increased many fold, and the acquisition of this right of way would now cost many times the amount the respondent expended therefor. But $30,000 of its stock has ever been issued. On or about January 1, 1879, respondent made and thereafter negotiated its negotiable coupon bonds, to the amount of $150,000, payable 30 years from that date, with interest at 7 per cent. per annum, payable semi-annually, and to secure them mortgaged its entire property and franchises to trustees named. The proceeds of the stock and bonds were used in the construction and equipment of the railway, and were not sufficient for that purpose, and respondent from time to time borrowed an additional sum of about $90,000, and used it in construction and equipment. It began operating its railway June 1, 1879, and has ever since operated it. Its whole business is and always has been the switching of cars between the tracks of other railways, and mills and warehouses along its own lines in the city of Minneapolis. Until September 1, 1882, it charged for its services in switching only one dollar per loaded car, but on that date raised its charge, which has ever since been $1.50 per loaded car. The service rendered by it is of a

character such as would otherwise be performed by drays and wagons at a much greater cost than respondent's last-mentioned rate of $1.50 per loaded car, which does not exceed and is a fair and reasonable rate.

From the beginning of the operation of its railway to and including June 30, 1887, notwithstanding its increase of rate, respondent's gross earnings were less than its operating expenses and the interest on its mortgage bonds, by the sum of $21,223.76. All the excess of its gross earnings over operating expenses has been applied to the repayment of the unsecured indebtedness of $90,000 for money used in construction and equipment and the interest thereon. And of this unsecured indebtedness there remained unpaid on June 30, 1888, the sum of $12,211.02, of which $10,000 was paid from earnings on and prior to November 30, 1888, when $2,211.02 was still unpaid. By reason of this application of its earnings no interest has been paid, nor has respondent had any funds with which to pay interest, on its bonded debt, and such interest has accumulated and remains unpaid to the amount of $105,000. In the year ending June 30, 1888, its last completed fiscal year, the respondent transported over its lines 27,272 loaded cars, which was its entire business, and received, at the rate of $1.50 per car, the sum of $40,908, which constituted its entire receipts for that year. It therewith paid its operating expenses for the same year, amounting to $22,583.78, and paid the entire residue on account of and in reduction of its unsecured indebtedness and the interest thereon. The year was an unusually prosperous one, and was the first in respondent's history when it earned a sum equal to its operating expenses and one year's interest on its bonded debt. Induced by respondent's gradually paying off its unsecured indebtedness, the holders of that indebtedness have hitherto, at respondent's request, advanced to the holders of the interest coupons on its mortgage bonds the amount thereof as they became due, and have thereupon taken them up, and protected respondent's credit, and avoided foreclosure, which has only been avoided by this means.

Part of respondent's railway on the west side of the Mississippi river, about 1,200 feet in length, is upon wooden trestle work, now

nearly ten years old, and about 1,100 feet of this is so decayed and worn that it must be almost entirely renewed and rebuilt within the current year, 1889, if the operation of the railway is to be continued. Respondent has no source of revenue other than its earnings to meet the expenses of rebuilding, which will exceed $15,000 if the trestle is rebuilt of wood, and $80,000 if rebuilt of iron or steel. If the order of the commission set forth in the writ had been forthwith and hitherto enforced, and respondent had received but one dollar per car for services rendered during its last fiscal year, its entire receipts from all its business in that year would have been but $27,272, which would have left but $4,688.22 with which to pay either the residue of its unsecured indebtedness then existing, $12,000, or to pay the sum of $10,500, annual interest on its bonded debt, leaving nothing for extraordinary repairs or for renewals of trestles, bridges, or rails.

The respondent is owner of all the railway used in conducting its business, subject only to the lien of the mortgage. It is entitled to the possession and beneficial use thereof to the same extent as the owners of other property are entitled to the beneficial use thereof. It has the right to fix the price for the use of its property by others and the rates at which it will do business for others, subject only to the qualification that the rates so fixed shall be equal and reasonable. The rate of $1.50 per car so fixed and collected by it is just and reasonable, and the rate of $1.00 per car specified in the order of the commission is grossly unfair, unjust, unequal, and unreasonable, and beyond the jurisdiction and power of the commission.

The commission's recommendation by which it seeks to compel a reduction in respondent's rates from $1.50 to $1.00 per car, and the consequent loss in revenue of one-third of its entire earnings, was made without notice to respondent, and without giving it any opportunity to be heard in its own behalf, and for that reason is against the common rights of American citizens, is in violation of the constitution of the United States, and is wholly void. If the order be enforced by the mandate of this court, it will take respondent's property without due or any process of law, in violation of section 1, of article 14, of the amendments of the constitution of the United States. If the order be enforced and respondent's charge be reduced to one dol-

lar per car, it would be deprived of the ability to pay the interest on its bonded debt as it has, with the consent of the state of Minnesota, contracted to do; and any law of the state, or order of the commission, or judgment of this court, preventing respondent from performing its said contract, when, without such law, order, or judgment it might have performed or might hereafter perform the same, is and will be a law, order, and judgment impairing the obligation of a contract, and in violation of section 10, of article 1, of the constitution of the United States, and is and will be wholly void. The commission's order, if enforced, will deprive respondent of its property, for the use and benefit of private citizens, without making any compensation to it as the owner thereof, in violation of section 13, article 1, of the constitution of the state of Minnesota, and is and will be wholly void.

By section 4, of article 10, of the constitution of the state, the respondent is bound to carry the mineral, agricultural, and other productions or manufactures of the state on equal and reasonable terms. It has always so carried them when offered to it for that purpose. The terms offered by it for such carriage have always been equal and uniform to all persons, and reasonable in amount. It is entitled to have and receive reasonable compensation for the services it is so bound to render, and the commission's order assumes to fix a grossly inadequate and unreasonable compensation therefor, and is in violation of the constitutional provision last mentioned, and is wholly void.

The cause having been continued to January 29th, on that day came on for hearing. The respondent asked leave to make proof of the matters alleged in the return at such time as the court may appoint. The attorney general moved the court for judgment upon the petition, alternative writ, and answer, and for the issuance of a peremptory writ. The respondent's motion was denied, and that of the attorney general was granted, the following opinion being filed.

*Moses E. Clapp,* Attorney General, and *Morrison, Flannery & Cooke,* for relator.

*W. H. Norris* and *James H. Howe,* for respondent.

GILFILLAN, C. J. This case being similar to that of *State* v. *Chicago, Mil. & St. Paul Ry. Co.,* 38 Minn. 281, (37 N. W. Rep. 782,) decided at the October term, 1887, the decision will follow the decis-

ion in that case, and, upon the reasons stated in the opinion filed in that case, let a peremptory writ of *mandamus* issue.

NOTE. On February 27, 1889, judgment was entered, and on March 11th the cause was removed by writ of error to the supreme court of the United States, the writ being allowed and a *supersedeas* bond approved by a justice of that court.