STATE OF MINNESOTA, *ex rel.* George Ketcham, *vs.* ST. PAUL, MINNEAPOLIS & MANITOBA RAILWAY COMPANY and another.

### April 9, 1889.

**Railway Connections—Inconsistent Statutes—Repeal by Implication.**
Subdivision *a* of section 3, c. 10, Laws 1887, being a part of an act entitled "An act to regulate common carriers, and creating the railroad and warehouse commission of the state of Minnesota, and defining the duties of such commission in relation to common carriers," is inconsistent with and so far supersedes section 1, c. 14, Laws 1887, known as the "Freedom of Traffic Act," as to operate as a repeal of said section.

Appeal by the above named defendant and the Minneapolis & Pacific Ry. Co., from a judgment of the district court for Grant county, *C. L. Brown*, J., presiding, in a proceeding by *mandamus*, instituted by the relator as county attorney of that county, to compel the defendants to "provide ample facilities for transferring cars from their respective tracks, one to the other," at a crossing of the tracks of the two companies at Elbow Lake in the same county.

*M. D. Grover* and *J. D. Springer*, for appellants.

*Moses E. Clapp*, Attorney General, and *George Ketcham*, for respondent, (relator.)

COLLINS, J. Action of *mandamus* to compel the defendant railway companies to connect their respective lines of road at a place of crossing in Grant county. The defendants appeal from an order of the court refusing a new trial, and from a judgment requiring them "to immediately provide ample facilities for transferring cars from their respective tracks, one to the other, at the crossing or intersection" specified. The proceeding is under the provisions of chapter 14, Laws 1887, generally known as the "Freedom of Traffic Law," and was brought upon the relation of the county attorney of said county; it being made his duty by section 5 of said chapter to prosecute all offenders, and to enforce, by proceedings in court, all of the provisions and penalties of the act. The defendants contend and rest their case upon three propositions, insisting that, if either be sustained, the order and judgment from which they appeal must be reversed. They allege—*First*, that the act in question was not legally and constitutionally passed by either senate or house; *second*, that, if it should be declared properly passed, it was repealed at the same legislative session upon the passage of an act entitled "An act to regulate common carriers, and creating the railroad and warehouse commission, * * * and defining the duties of such commission in relation to common carriers," now chapter 10, Laws 1887; and, *third*, that, if legally passed and not repealed, the law is unconstitutional.

It must be admitted that, if there be merit in either of these positions, the appellants are right, and the judgment cannot stand. The only one of these assertions which, in our opinion, we need to

consider at this time, is in regard to the repeal of chapter 14, under which this proceeding was instituted, by chapter 10, before mentioned. From the session laws and the record before us it appears that the freedom of traffic act was presented early in the legislative session, as senate file 46, while the bill in regard to common carriers was introduced near the close of the session, as senate file 557. The first named met with much opposition and some reverses, but was passed shortly before the adjournment, and received the governor's approval March 5th. The latter (chapter 10) was approved two days later, March 7th. It is of common history that the subject-matter found in and covered by it had been exhaustively discussed, during the session, in committee and upon the floor of each branch of the legislature, while the members had under consideration the many bills which had been introduced, designed to cover the same ground, and which had been advanced to various stages upon the calendars; and that chapter 10, as finally passed, is the result of the earnest conferences of those who were specially devoted to legislation of that character. The policy of the state in committing a general supervision of railways to a board of commissioners, whose duties are definitely specified and in whom great power and authority is confided, seems clearly manifested, and made a conspicuous feature of the act. The design seems to have been to vest in the persons who might occupy the very responsible positions created by the law, ample power to promptly and with little circumlocution examine and adjust such complaints as might be made by the patrons of these vast corporations in regard to the management, the business facilities afforded, and the rates charged by them for the transportation of passengers and freight. The necessity of such an act, and the right of the people to legislate in reference to the matters therein embraced, cannot now be questioned. As was well said in *State* v. *Chicago, Mil. & St. Paul Ry. Co.*, 38 Minn. 281, 297, (37 N. W. Rep. 782,) the question was settled "in accordance with public policy and public necessity; for no modern civilized community could long endure that their public highway system should be in the uncontrolled, exclusive use of private owners. The only alternative was either governmental regulation or governmental ownership." This law superseded others in regard to the

same subject.   It not only gave to the board advisory powers of the
same character as those conferred by the federal congress upon the
commissioners appointed to carry out the provisions of the "Inter-
state Commerce Act," but it went much further, and authorized that
a schedule of rates for transportation might be fixed by which the
roads should be guided, and that, when so fixed, the action of the
board should be final and conclusive.    *State* v. *Chicago, Mil. & St.
Paul Ry. Co., supra; Ry. Transfer Co.* v. *Railroad Commission,* 39
Minn. 231, (39 N. W. Rep. 150.)   In these facts, and in granting to
the board such unlimited and exclusive authority, and in specifying
so minutely the powers and privileges it possessed and could exercise,
we find abundant evidence that it was the intent and purpose of the
law-makers to confide to the sound discretion and good judgment of
its members the rights and welfare of the people, as well as the in-
terests and prosperity of the corporations.    We nowhere discover a
design to cripple the roads, or a disposition to demand of them un-
reasonable things, but there clearly and unmistakably appears a de-
termination to provide for a supervision and control of the manage-
ment, so that the public should not be oppressed by unjust discrim-
inations, unequal rates, and unfair restrictions, and that ample facil-
ities should be afforded for the transaction of business.

From this it is manifest that there was uppermost in the minds of
the legislators a desire to reduce the various laws then existing, re-
lating to the rights and duties of common carriers, to a comprehen-
sive system, and an idea to secure a speedy enforcement of the sys-
tem by and through a commission consisting of but three men, pro-
hibited from engaging in other business, and whose chief legal ad-
viser should be the attorney general of the state.   Keeping this in
mind, we pass to an examination and comparison of such sections of
these two enactments as seem to have a bearing upon this case.   Sec-
tion 1, *c.* 14, provides that all railway companies in the state "shall
provide ample facilities for transferring cars from their track to any
other joining, crossing, or intersecting railway track," except in spe-
cial cases, which cases may be determined by the board of commis-
sioners; which board had, in fact, existed in this state for several
years prior to the introduction and passage of the law.   In subdivis-

ion *a*, § 3, *c*. 10, we find it declared that "all common carriers subject to the provisions of this act shall, according to their respective powers, provide at the point of connection, crossing, or intersection ample facilities for transferring cars" from their tracks to those of a connecting, crossing, or intersecting road. The subdivision goes further, and provides for the accommodation and transfer of passengers and freight, and the interchange of traffic at such points, without discrimination in rates or charges. The design of both of these enactments is to compel intersecting roads to connect in the usual manner, by spur tracks and switches. It may be admitted that under chapter 14 this is made imperative, unless an exception be granted by the railroad commissioners, and that under chapter 10 the duty is dependent upon the action of the board when complaint is made that ample facilities for transfer are withheld at any particular point. It makes but little difference, practically, whether it be determined that both or but one of these independent sections be declared the law, for in any case the final determination is with the board of railway commissioners. In the one instance the intersecting roads demand to be excepted from the operation of the act as provided by section 1, *c*. 14; in the other, complaint is made, and the board investigate the alleged grievance, as they would any other, and then determine what the public interests require. The subdivision of section 3, *c*. 10, is not only as effectual upon the point involved here, but is more in detail and more comprehensive, of more real value to the people, than the other. It is also in harmony with the system adopted by the state, before referred to, upon the subject of railway supervision and regulation. For these reasons we give no weight to the suggestion of counsel for the respondent that the difference in these acts possesses great significance.

Passing, without considering, other sections of chapters 10 and 14, much the same, although differently worded, we find that by the terms of section 5, *c*. 14, the duty of enforcing the freedom of traffic act is cast upon each county attorney in the state, should the offence be committed in each county, and no other officer has any authority in the premises. He is directed to institute proceedings against the offender in the name and at the expense of the state. Over this prosecution,

whether it be to enforce the provisions and compel the connections, or to inflict and recover the penalties prescribed by sections 4 and 6, the railway commissioners have no control, and need have no knowledge. As before stated, the general law, (chapter 10,) covering this whole matter, makes the attorney general of the state *ex officio* the law-officer of the board, and it is his duty to institute and prosecute (section 9, subd. *h*) any and all suits which the commissioners may desire to bring. The county attorney shall assist, when called upon, and, if occasion requires, additional legal talent may be employed by the commissioners. This section fully covers, in a brief but complete manner, every action which is demanded by public interests, and places the responsibility of a prompt and thorough prosecution in all parts of the state, when directed by the commissioners, in the hands of their legal adviser, the officer selected by the people of the state for the head of its law department. There is further provision that all prosecutions shall be in the name of the state, (except as provided in the act or by any law of the state,) and may be instituted in any county through which the line of the offending road may pass. Here, then, we have, if both laws can be pronounced in force, the duty imposed upon the attorney general to take charge and direct suits, and the same obligation placed upon each county attorney. In addition to this, the latter is directed to aid the attorney general by one of the acts, and the board may also in its discretion employ other counsel to assist in the proceedings. Unless simultaneous prosecutions for the same offence could be maintained, it is difficult to see how the conflicting rights of counsel could be reconciled, and these legal gentlemen accommodated in the performance of a statutory duty. It seems superfluous for us to say that but one proceeding to compel the construction of connecting tracks could be maintained under the same state of facts, and that but one action of a criminal nature could be permitted against the same defendant, for the same offence.

We now come to a consideration of the sections in each of these acts providing for the infliction of a fine in case of a refusal or neglect to conform to its provisions. By section 4, *c.* 14, the corporation which *wilfully and maliciously* refuses or neglects to observe the act shall be fined, for the first offence, not less than *five hundred* nor more

than *one thousand dollars*, and not less than *one thousand dollars* for the second offence.   Section 6 of the same chapter makes *any railroad official who wilfully and maliciously* refuses or neglects to comply with the provisions of the act *guilty of a misdemeanor* and subject to a fine of not less than *one thousand dollars,* while all fines accruing from an enforcement of the law shall go into the state treasury for the benefit of the *school fund.*   By section 12, *c.* 10, the corporation, and its directors and officers, its receiver, trustee, lessee, agent, .etc., may be prosecuted for any *wilful* act prohibited, or any *wilful* omission or failure to comply with the terms, or any *wilful* infraction of the law, and on conviction shall be subject to a penalty of not less than *two thousand five hundred* nor more than *five thousand dollars* for the first offence, and for each subsequent offence not less than *five thousand* nor more than *ten thousand dollars*, and all moneys derived in this way shall go to the *general revenue* fund of the state.   (The italics are the writer's.)

We find, therefore, that by virtue of the provisions of one of these acts, the county attorney is alone authorized to conduct the proceedings, which must be instituted in the county in which the law is transgressed.   By the other, the object, purpose, and method being practically the same, the board of railway commissioners, whose sole business is to investigate and regulate the conduct of all railways in the state, must first direct the prosecution, and it is exclusively under the control of the attorney general, who may bring the action in any of the counties traversed by the track of the offending corporation. A duty is imposed upon the county attorney wholly inconsistent with that fixed in the freedom of traffic act.   In the one case there must be a wilful and malicious violation of the law by the corporation before a penalty attaches, and the fine for the first offence cannot exceed $1,000; for the second it cannot be less than $1,000; or, in case of a wilful and malicious violation of the law by a railway official, the fine upon conviction shall not be less than $1,000.   While by virtue of the other act (chapter 10) a wilful violation of its terms by a corporation, or by a director, officer, receiver, agent, etc., is punished by a penalty of not less than $2,500 for the first, and not less than $5,000 for each subsequent, offence.   There must be a wilful and

malicious violation of the law to warrant conviction under chapter 14, while the violation need be but wilful to authorize conviction under chapter 10. The fines contemplated by the "freedom of traffic act" go into the school fund, while those mentioned in the act to regulate common carriers, largely in excess of the others, pass to the credit of the general revenue fund of the state. The latter law repeals all acts and parts of acts inconsistent with it, and evidently manifests a fixed purpose to commit the subject of railways and their management into the hands of a careful and capable board of commissioners, while the other departs from that purpose, and is at variance with its spirit. The rules of law relating to repeal by implication have been laid down by this court in *Moss* v. *City of St. Paul*, 21 Minn. 421, and other cases, and are well understood. But we think this case clearly falls within the principles established in *Smith* v. *County of Nobles*, 37 Minn. 535, (35 N. W. Rep. 383.) We are of the opinion that subdivision *a*, § 3, c. 10, was intended as a substitute for section 1, c. 14, and so far supersedes that it operates as a repeal of said section 1.

Judgment reversed.