THE STATE ex rel. M. E. RHODES v. PUBLIC
SERVICE COMMISSION and CHICAGO & AL-
TON RAILROAD COMPANY, Appellants.

In Banc, April 9, 1917.

1. **RAILROAD RATES: Power of Public Service Commission.** Section
47 of the Public Service Commission Act, Laws 1913, p. 583, con-
fers upon the Commission authority to raise railroad rates above
the maximum theretofore fixed by the Legislature.

2. ————: **General Powers of Legislature.** The General Assembly may
pass any law upon any subject not forbidden by the organic law.
That power is conferred by section 1 of article 4 of the Constitu-
tion, which says that "the legislative power, subject to the limita-
tions herein contained, shall be vested in a Senate and House of
Representatives, to be styled 'the General Assembly of the State of
Missouri.'" Pursuant to this general power to enact legislation,
the General Assembly had enacted laws fixing maximum passen-
ger and freight charges prior to the incorporation of section 14 of
article 12 in the Constitution of 1875 which explicitly conferred the
power of "establishing reasonable maximum rates." [Explaining
statement in State v. M. K. & T. Ry. Co., 262 Mo. 1. c. 522.]

3. ———: Railroad Rates: Power of Legislature. The General Assembly has power to fix reasonable maximum rates for the carriage of freight and passengers, in the absence of any specific authority such as is contained in section 14 of article 12 of the Constitution explicitly conferring the power.

4. ———: ———: ———: Delegation of Power. The power of prescribing maximum rates for common carriers, which the Legislature inherently possesses, may be delegated to a railroad commission or to a public service commission, unless inhibited by express constitutional provision. And if the fixing of rates is to proceed intelligently along lines of fairness to all concerned—to passenger, shipper, carrier, laborer and the public—with due regard to constant mutations in costs of labor and the amount of traffic, the matter should be delegated to a body having time for investigation and aided by expert machinery and having greater flexibility than a short-term Legislature possesses.

5. ———: ———: ———: Constitutional. Although by doing so it repealed existing statutes fixing maximum rates, the Legislature was not inhibited by the provision of the Constitution declaring that "the General Assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in the State, and shall from time to time pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on said railroads" from creating the Public Service Commission and directing it, after a hearing and proper expert investigation, to ascertain what maximum rates are reasonable and fix the same by an order, and declaring that said rates so ascertained and fixed should "thereafter be observed" by the railroads. The Legislature did not thereby delegate to the Commission the absolute power of fixing maximum rates, but only the power to ascertain and determine what rates are reasonable, and it is those rates that the General Assembly "established"—subject all the time to review by the courts as to their reasonableness.

Held, by BOND, J.; dissenting, that since the General Assembly did exercise its exclusive power to establish and fix maximum rates, it could not thereafter exercise it again except through the medium of its own power as a legislative body; and since the Constitution says that the General Assembly shall establish maximum rates, it was powerless to delegate the power to any commission, and to do so is to contravene this constitutional provision.

Appeal from Cole Circuit Court.—*Hon. J. G. Slate, Judge.*

REVERSED AND REMANDED (*with directions*).

*Alex. Z. Patterson* and *James D. Lindsay* for appellant Public Service Commission.

(1) Section 14 of article 12 of the Constitution was appropriated by our Constitutional Convention of 1875 from the Illinois Constitution, adopted in 1870. Sec. 12, art. 11, Constitution of Illinois; McGrew v. Mo. Pac. Ry. Co., 230 Mo. 518. (2) Prior to the adoption of section 14 of article 12, the Legislature of the State of Illinois had directly and explicitly, by enactment, delegated to the Board of Railroad and Warehouse Commissioners of that State the power to establish "schedules of reasonable maximum rates of charges" for railroad transportation. Such enactment was subsequent to the adoption of the Illinois constitutional provision, and must be regarded as the legislative construction of the State of Illinois of her Constitutional provision. Act of May 2, 1873, R. S. Ill., chap. 114, p. 951, secs. 124, 133; C., B. & Q. R. Co. v. Jones, 149 Ill. 361. (3) Legislative construction of a constitutional provision that is subsequently adopted by another State is regarded as high and convincing authority by the adopting State. Langdon v. Applegate, 5 Ind. 327; McGrew v. Mo. Pac. Ry. Co., 230 Mo. 496. (4) The rule in adopting, with borrowed constitutional provisions and statutes, their constructions, is manifestly just and right; for if it were intended to exclude any known constructions of such provisions or statutes, the necessary presumption is that their terms would be so changed when they are adopted as to effect that intention. McGrew v. Mo. Pac. Ry. Co., 230 Mo. 519; Myrick v. Hasey, 27 Mo. 9; Com. v. Hartnett, 3 Gray (Mass.), 450; Pennock v. Dialogue, 2 Pet. (U. S.) 1; Hogg v. Emerson, 6 How. (U. S.) 483. (5) The court of last resort of the State of Illinois has held, subsequent to our adoption of its constitutional provision of 1870, that the Act of the Legislature of 1873 of that State delegating the rate-making function to the Railroad and Warehouse Commission, was not an unconstitutional dele-

gation of legislative power. And such decision was rendered after a definite and particular consideration of section 12 of article 11 of the Illinois Constitution, corresponding to our constitutional provision. Such holding, though subsequent to our adoption of the Illinois constitutional provision, is entitled to great weight as persuasive authority. C., B. & Q. R. Co. v. Jones, 149 Ill. 361. (6) Delegation of rate-making power by the Legislature to proper administrative boards or commissions is approved by the courts as the most equitable, suitable and fair means of regulating the charges of railroad corporations. Reagen v. Loan & Trust Co., 154 U. S. 362; R. R. Commission Cases, 116 U. S. 307; Tilley v. Railroad Co., 5 Fed. 641; Railroad v. Dey, 35 Fed. 866; Railroad v. Smith, 70 Ga. 694; Express Co. v. Railroad, 111 N. C. 472; McWhirter v. Railroad, 24 Fla. 471; Noyles on American R. R. Rates, pp. 206, 207; State ex rel. v. Public Service Comm., 259 Mo. 726.

*Scarritt, Scarritt, Jones & Miller* for appellant Chicago & Alton Railroad Company.

(1) The issue in this case has been previously ruled by this court. State ex rel. v. Public Service Commission, 259 Mo. 704. (2) There is no merit in relator's contention that section 14, article 12, of the Constitution of Missouri was not called to the attention of this court, or considered by this court in reaching their judgment in the case of State ex rel. v. Public Service Commission. (3) The claim of relator that section 14 of article 12 of the Constitution restricts and incapacitates the Legislature from establishing reasonable maximum rates for railroads by and through such a public service commission as ours, and that the rates when so established will not supersede prior maximum rates fixed by the Legislature, is not supported by reason or precedent. The evident purpose of the people of Missouri through these constitutional provisions was to have laws enacted which should prevent unjust discriminations and ex-

tortions in the rates of railroads, and to correct abuses in the operation of railroads, and to allow reasonable rates to be charged and collected by railroads, and to prevent special and exclusive privileges either through unauthorized customs or through special laws, and to prevent discriminations or preferences in the rates charged or facilities furnished, and to prevent railroads from showing favoritism by charging more for a shorter than for a longer haul. The main purpose appears to be to bring about the enactment of such laws as are here indicated—to stir the legislative body into action—and not to limit the grant of legislative authority expressed in article 3 and section 1 of article 4 of the same document. This Public Service Commission law declares that rates shall be just and reasonable and not discriminatory, and reasonably leaves to a duly constituted commission the province of investigating and determining what are unreasonable charges and what are discriminatory practices and what this or that railroad should do reasonably to accommodate traffic. And so the Legislature has established that law and has wisely committed to an administrative body the functions of enforcing it. This statute canot be said to be a delegation of a law-making power vested in the Legislature. It is more properly referred to as one referring the matter of administration duly established by a valid statute to an administrative commission to carry its wise provisions into effect. State ex inf. v. Gas Co., 254 Mo. 515; State ex rel. v. Public Service Comm., 259 Mo. 704. (4) That the State of Missouri by a duly enacted statute may delegate to the Public Service Commission the power to regulate and control railroads and other public utilities within the State is settled beyond all question in this State. State ex inf. v. Gas Co., 254 Mo. 515; State ex rel. v. Public Service Comm., 259 Mo. 704. A State in the exercise of its police power can, as an attribute of sovereignty, without any constitutional provision granting that power, regu-

late the business and fix the rates of its domestic utilities, either directly through an act of its Legislature or through such a commission as the Public Service Commission, unless there be an express restriction of general legislative authority so to do in the State Constitution.    Non-action of the Legislature cannot confer power to delegate.    It seems to be generally conceded even by our opponents, that if the Legislature had not established a maximum statutory rate, then the Commission could do so. If the power cannot be delegated by the Legislature, how can a failure of the Legislature to establish maximum statutory rates confer the power on the Legislature to delegate to the Commission? Can such a position be logical? The question answers itself in the negative. Chicago, B. & Q. R. Co. v. Cutts, 94 U. S. 155; State ex rel. Public Service Commission v. Baltimore & Ohio R. R. Co., 85 S. E. 714; State ex rel. Great Northern R. R. Co. v. Railroad Commission, 52 Wash. 33; Chicago, B. & Q. R. Co. v. Jones, 149 Ill. 361; Georgia Railroad Co. v. Smith, 70 Ga. 694; Tilley v. Savannah R. Co. et al., 5 Fed. 641; Railroad Commission v. Central of Georgia, 170 Fed. 225.

*M. E. Rhodes* for respondent.

(1) Section 1, article 4, of the Constitution provides: "The legislative power, subject to the limitations herein contained, shall be vested in a Senate and House of Representatives, to be styled the General Assembly of the State of Missouri." Respondent contends the power thus conferred must be exercised by the General Assembly alone, and that the General Assembly cannot delegate such power to any other body or branch of government. State v. Field, 17 Mo. 529; Owen v. Baer, 154 Mo. 505; Merchants' Exchange v. Knott, 212 Mo. 641; State ex inf. v. Carlisle, 235 Mo. 259; State to use v. Cochrane, 264 Mo. 591. That a legislative power cannot be exercised by any other authority than the legislative department of the government is fully sustained by the following authorities from other jurisdictions: State v. Railway Co., 100

Minn. 445; Valley v. Park Comrs., 16 N. D. 25; People v. Election Comrs., 221 Ill. 9; Noell v. People, 187 Ill. 587; Mitchell v. State, 134 Ala. 392; Fite v. State, 114 Tenn. 646; In re Incorporation of Milwaukee, 93 Wis. 616; Hovey v. Comrs., 56 Kan. 577; State v. Johnson, 61 Kan. 603; Harbor Comrs. v. Railroad, 88 Cal. 491; Ex parte Cox, 63 Cal. 21; Boyd v. Bryant, 39 Ark. 69; Nall v. Kelly, 179 S. W. 486; Commonwealth v. Adams, 95 Ky. 586; Trustees v. Webb, 71 S. E. 520; Marryman v. Banking Board, 111 Pac. 295; 2 Wyman on Pub. Service Corp., sec. 1404; Reeder, Rate Regulations, sec. 38; Cooley, Const. Lim. (6 Ed.), 137; 6 Am. & Eng. Ency. Law (2 Ed.), p. 1020; United States v. Grimaud, 220 U. S. 506; Light v. United States, 220 U. S. 523; Interstate Com. Comm. v. Transit Co., 224 U. S. 194. (2) Section 47 of the Pubilc Service Commission Act provided: "Whenever the Commission shall be of opinion . . . that the maximum rates, fares or charges, chargeable by any such common carrier, railroad corporation or street railroad corporation are insufficient to yield reasonable compensation for the service rendered and are unjust and unreasonable, the Commission shall, with due regard among other things to a reasonable average return upon the value of the property actually used in the public service and to the necessity of making reservation out of income for surplus and contingencies, determine the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute, and shall fix the same by order to be served upon all common carriers, railroad corporations or street railroad corporations by whom such rates, fares and charges are thereafter to be observed." The power thus conferred is purely administrative, and it has been so held on the admission of counsel for the Commission. State ex rel. v. Public

Service Commission, 259 Mo. 727. (See brief for respondent in the same case.) It is said in the case above cited that the Public Service Commission Act is referable to the police powers of the State (l. c. 712). Such powers must be exercised by the Legislature and cannot be delegated. (3) If the authority conferred upon the Public Service Commission to increase rates, "notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute," is limited to an increase only where the railroad company is charging less than "has been heretofore authorized by statute," then the act is constitutional. If, on the other hand, the authority to increase rates is not thus limited, and the Commission is given power to increase rates above the maximum established by statute, the act is in conflict with section 1, article 4 and section 14, article 12 of the Constitution as being a delegation of legislative power, it is, therefore unconstitutional. (4) If a statute is susceptible of a construction that makes it obnoxious to the Constitution and also to one in harmony with its provisions, the latter construction must be adopted. State ex rel. v. Pike County, 144 Mo. 275; Ex parte Loving, 178 Mo. 203; State v. Moody, 202 Mo. 127. A construction of the act limiting the authority of the Public Service Commission to increase rates only in case where a lower rate is charged than fixed by law, and that such rates should not exceed the maximum rates established, makes the statute constitutional. The maxim, *Expressio unius est exclusio alterius,* applies, for the express mention of the conditions under which the Commission may increase rates, implies the exclusion of all other conditions.

FARIS, J.—This is an appeal from the circuit court of Cole County in a proceeding by *certiorari,* to bring up to that court the record of the Public Service Commission in a certain cause wherein some four-

teen railroads doing business in Missouri sought by an application to said Public Service Commission to obtain an increase in intrastate freight and passenger rates. The Public Service Commission (hereinafter, for brevity called the Commission), which is one of the appellants herein, granted some part of the relief prayed for; whereupon the relator, a citizen of Missouri, and a potential patron of the railroads of this State, brought the case up to the Cole Circuit Court by a so-called writ of review. This latter court reversed the finding of the Commission, and from such judgment of reversal the Commission, and the component individual members thereof, and the Chicago, & Alton Railroad Company have appealed.

The facts necessary to an understanding of the case are few and simple, and touching such facts as will serve to make clear the law points we find it necessary to discuss there is no dispute.

Historically and chronologically the facts as to the legislation which will come under review and the years of the passage thereof run thus:

In 1905 an act was passed by the Legislature establishing freight rates in this State. This act was amended in 1907.

There was also passed in 1907 an act fixing the intrastate passenger rates at two cents per mile per person upon the railroads which are parties to this application.

In 1913 there was passed by the Legislature the Public Service Commission Act, which act contained, among other provisions, a section designated as section 47, which it is averred conferred upon appellant Commission the power and duty of ascertaining and establishing reasonable maximum rates for the carriage of persons and freight in intrastate traffic upon the railroads in this State. More extended references to these several acts will be made hereinafter.

Pursuant to the power which the appellants urge was lodged in the Commission by said section 47,

appellant railroad and thirteen other railroads made on September 15, 1914, as stated, an application praying for the revision upwards of freight and passenger rates. After a comprehensive investigation by their rate experts and expert accountants and engineers, exhaustively and diligently carried on for more than a year, the Commission made its finding and entered orders granting to appellant Railroad Company and to the other common carriers named in the application for an increase of rates, certain modified measures of relief to take effect January 1, 1916. This finding, so far as the extent of our review here is concerned, is sufficiently set forth by appellant Commission in the below quoted language of their report and finding, to-wit:

"We conclude that the applicants herein are entitled to a measure of relief, but not to the extent of the rates as proposed by applicants. Therefore, an order in conformity with the views expressed herein should be entered fixing the reasonable rates, fares and charges for passenger service and commodity rates and charges for freight service to be in effect as maximum rates for the services to be performed for a period of twelve months from January 1, 1916, and thereafter until changed or abrogated by the Commission."

Thereafter in the Commission's order followed specifications of the reasonable maximum rates fixed by the Commission and to be charged by the several classes of railroads on divers commodities of merchandise, as well as an order fixing a maximum passenger rate per person per mile upon intrastate traffic upon the several classes of railroads; and orders requiring the issuance of round-trip tickets at two and a fourth cents; five-hundred-mile books, usable by bearer and persons for whom presented, and joint interchangeable thousand-mile books likewise usable by bearer and persons for whom presented, at two cents per mile. As stated, with the details of these matters and rates, we have here nothing to do; for the whole case

turns upon the question whether said section 47 conferred on the Commission under the Constitution the power and authority to make or fix reasonable maximum intrastate rates for the carriage of freight and passengers in this State.

If other facts shall become necessary in order to make clear the law points involved, these facts will be found set out in our opinion.

For convenience of expression we shall in setting forth our views speak of *delegating* the power of legislating to the Commission, while laboring to show that what has been done is either no delegation of power at all, or that it is a delegation which is beneficent and permissible and not forbidden.

I. The only questions in this case are questions of cold law. The stipulation filed so limits them and the points briefed by learned counsel upon both sides do the like. So as a limiting foreword we may observe that we approach their determination without any hampering compunctions touching whether the orders made by the Commission are upon the facts warranted or unwarranted, just or unjust, or whether as contended, the practical carrying out of these orders will prove so meagre in increase of income and so burdensome in accounting as to make actual defeat for the carriers out of seeming victory.

*Matters Excluded.*

The Legislature has acted by passing the Public Service Commission Act, containing among other provisions section 47, which delegated, it is contended upon one side and denied upon the other, the whole matter of railroad rate-making to the Commission, and its constitutional power to do this (if it did it) is here the bone of contention. The Commission has acted pursuant to its interpretation of the powers conferred upon it by the section supra. Within their respective legal spheres both the Legislative and the administrative branches have, it is contended and

denied, done what the law enjoins. It is our sole duty therefore as the other co-ordinate branch of government to see whether the legislative branch and the executive, or administrative, branch had the power to do what they have done. In short, we have nothing whatever to do with the facts, or the public policy involved, or with the inherent correctness, or incorrectness of the orders made; *it is alone our duty herein to deal with the power of the Legislature under the Constitution to pass section 47 and to interpret and construe its meaning and effect,* if it is valid under the Constitution. Therefore, it follows that concretely stated, the two questions involved are pure questions of law and they are: (a) Does section 47 (Laws 1913, p. 583) of the Public Service Commission Act confer authority upon the Commission to raise railroad rates above the maximum fixed by the Legislature? (b) If said section 47 has this effect, is it invalid because in violation of the provisions of section 14 of article 12 of the Constitution?

II. Taking these questions in their order and discussing them without noticing the phase of interdependence, we conclude that section 47 does confer this identical power upon the Commission. The pertinent portions of said section 47 read thus:

*Power to fix Rates Conferred.*

"Whenever the commission shall be of opinion, after a hearing had upon its own motion or upon complaint, . . . that the maximum rates, fares or charges, chargeable by any such common carrier, railroad corporation or street railroad corporation are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall with due regard among other things to a reasonable average return upon the value of the property actually used in the public service and to the necessity of making reservation out of income for surplus and contingencies, determine the

just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute, and shall fix the same by order to be served upon all common carriers, railroad corporations or street railroad corporations by whom such rates, fares and charges are thereafter to be observed." [Laws 1913, p. 583.]

We may observe as a foreword that: The Constitution of Missouri is a limitation upon the powers of the General Assembly, which body may therefore pass any law upon any subject not forbidden by our organic law, or by the Federal Constitution (Ex parte Roberts, 166 Mo. 1. c. 212; Railroad v. Otoe County, 16 Wall. 667), and there is no question here of the Federal Constitution. This power is conferred by section 1 of article 4 of the Constitution of 1875, which says: "The legislative power, subject to the limitations herein contained, shall be vested in a Senate and House of Representatives, to be styled 'the General Assembly of the State of Missouri.'" [Cf. Sec. 1, art. 3, Constitution 1820; Sec. 1, art. 4, Constitution 1865.] Pursuant to this general power of enacting legislation, and long prior to the adoption of section 14 of article 12 of the Constitution of 1875 (which appeared for the first time in the Constitution of 1875), the General Assembly of this State had passed laws for the regulation of railroads and fixing maximum rates for the transportation of passengers at four cents a mile (Laws 1863-4, sec. 2, p. 48), and in a loose and general way fixing the maximum freight rates for the carriage of different classes of commodities, subject, however, *to classification by the railroads themselves.* [Laws 1863-4, sec. 3, p. 48.] This act was amended in 1865, among other ways by increasing the maximum rate per passenger per mile to six cents. [Secs. 30 and 31, p. 340 et seq., G. S. 1865.] In 1875, but prior to the adoption of our express

constitutional provision (Sec. 14, art. 12, Constitution 1875) explicitly conferring upon the Legislature the power of *"establishing reasonable maximum rates,"* the Legislature for the first time passed an act, both *fixing* maximum freight and passenger rates and *dividing* the railroads of the State, as well as divers commodities of commerce into classes. [Laws 1875, p. 112 et seq.] Here then are three instances of legislation fixing maximum rates, some of them long prior to the adoption of the express constitutional provision here under discussion. [Sec. 14, art. 12, Constitution 1875.]

In passing, we may here fitly observe that the statement loosely made by the writer *arguendo* in State v. Missouri, Kansas & Texas Ry. Co., 262 Mo. l. c. 522, that "the only constitutional power to establish a reasonable maximum rate of charge for such service comes from said section 14 of the Constitution," was to an extent inaccurate. What was there meant was that said section contains the only express language of our Constitution conferring this power. The statement was *obiter* loosely made in discussing *arguendo* whether a rate made pursuant thereto was a legislative determination of the reasonableness of such rate within the purview of other provisions of said section 12 of the Constitution which forbids unjust discrimination.

Which brings us as a corollary to the question whether the effect of the passage *inter alia* of section 47, supra, of the Public Service Commission Act, was to repeal conditionally the freight regulation act of 1905 (Laws 1905, p. 102), as amended in 1907 (Laws 1907, p. 171 et seq.), and the passenger rate act of 1907 (Laws 1907, p. 170). This matter has so recently been examined and so ably and exhaustively treated by LAMM, C. J., in the case of State ex rel. Missouri Southern Railroad Co. v. Public Service Commission, 259 Mo. l. c. 728, a case In Banc, in which the whole court concurred, that further exposition would but cumber the books. In that case our

learned former colleague said, and we all concurred in this, to-wit:

"In so far as elder statutes undertook to make hard-and-fast rates, charges that might be lowered but not raised so as to conform with 'reasonable compensation,' or 'reasonable average return on the value of the property actually used in the public service' by the corporation, it must be held they were inconsistent and in conflict with the Utilities Act in those particulars and stand modified by the later act when the facts warrant, which later act, under canonized rules of construction, and as a younger act covering the field, must control. It is not necessary for us to hold that all statutory rate provisions were *eo instante* and *ipso facto,* repealed. It is sufficient for us to hold and we do hold that the Legislature could delegate to the Commission, as an administrative body, the power to ascertain facts warranting a readjustment of rates in accordance with the general statutory rules announced by the lawmaker (as is the case here), and that when such rate was so ascertained the modification of rates contemplated by the statute might take effect under the orders of the Commission despite the elder statutes. This leaves statutory maximum rates in force until facts established before the Commission call into play the modifications contemplated by the Utilities Act. In no other way can the statute be given vigor and be made a complete and rounded scheme adjusting itself to meet the form and pressure of the facts in each particular case and subserving right ends. If the result reached aids a crippled and distressed public service corporation on the one hand in a given case, or a distressed and harrassed public on the other in another given case, then, in either event, justice is done. It cannot be expected that this court will take color from corporate prejudice, if such exists. It ought not to be expected that through fear of popular disfavor we would coyly toy with a situation. If there are nettles to be handled the right

plan is to grasp them with a firm hand. The sting is less. We sit here, as we see it (and take leave to say so) to administer justice to individual and corporation, those in power and those out, the weak, the strong, the high, the low, indifferently, peradventure fearing none and fawning on none. The claim so made for ourselves we accord unstintingly to the Honorable Public Service Commission of the State of Missouri. To that end the Commission should set aside their order dismissing the complaint, reinstate the proceedings, set a day and place for a hearing and proceed to take the proofs to the end that the matter may be disposed of as the facts warrant.''

After again examining with infinite care the section under discussion, we are unable to detect any error in our former ruling, as to the bare effect upon existing rate-fixing statutes of the passage of the later law as contained in section 47, supra. Indeed, as Judge LAMM very broadly intimates, if we are to have, or retain in its integrity any law at all regulating public utilities, any other view or construction of the above section would be shocking in its inequities and unfairness. Pertinently, on this very point Judge LAMM, at page 725 of the case of State ex rel. Missouri Southern Railroad Co. v. Public Service Commission, supra, said:

''We take it that a decent respect for the Legislature precludes the theory that the Commission was given control of expenditures and denied control of income, the two being inseparable in the very nature of things. Moreover, it precludes the theory the Commission was given power to ascertain a just rate and then (wonderful to relate) was denied power to enforce it—that prior legislation controlled the rate, while the Commission controlled the outgo, thereby providing an upper and nether millstone with the corporation between. Therefore it follows that, if the hand of the Legislature by former acts was so laid on rates that no power existed to increase a

hard-and-fast maximum general statutory rate (established to cover all cases and arrived at by legislative guess, however intelligent the guess may be, as seems to be the case at the time the Utilities Act was passed), the conclusion is irresistible that the Legislature intended its hand should be lifted and that by general rules and methods prescribed for. the guidance of the commission, as here, it was intended that it first ascertain the facts and next should apply them in regulating rates, up or down."

III. The question of the right of a Legislature to fix reasonable maximum rates for the carriage of freight and passengers, absent *any specific authority* such as is contained in section 14 of article Power of 12 of our Constitution, is too well settled Legislature. in this State and in all other jurisdictions for either cavil or dispute. [Granger Cases, 94 U. S. 113-187; Saratoga Springs v. Saratoga Light & Power Co., 191 N. Y. 123; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362; Southern Ind. Ry. v. Railroad Commission, 172 Ind. 113; Railroad Commission Cases, 116 U. S. 307; Tilley v. Railroad, 5 Fed. 641; Stone v. Farmers' Loan & Trust Co., 116 U. S. 407; Dow v. Beidelman, 125 U. S. 680; Georgia Banking Co. v. Smith, 128 U. S. 174; Interstate Com. Com. v. Railroad, 167 U. S. 479; Chicago, B. & Q. R. R. Co. v. Iowa, 94 U. S. 155; Munn v. Illinois, 94 U. S. 113; McWhorter v. Pensacola & Atl. R. R. Co., 24 Fla. 417; State v. Atlantic Coast Line Ry. Co., 47 So. 969; Chicago, B. & Q. R. R. Co. v. Jones, 149 Ill. 361; Budd v. New York, 143 U. S. 517; State ex rel. v. Johnson, 61 Kan. 803; Stone v. Yazoo & M. V. R. R. Co., 62 Miss. 607; Atlantic Express Co. v. Railroad, 111 N. C. 463; Ruggles v. Illinois, 91 Ill. 256, 108 U. S. 526; Winchester & S. R. R. Co. v. Commission, 106 Va. 264.] While many of the above are cases wherein the question of the delegation of the power to a commission to regulate and to fix maximum rates was

chiefly in dispute, they are nevertheless in point here, for the simple reason that unless the Legislature itself possessed the power of fixing maximum rates, it is manifest it could not delegate any part of this power to a railroad commission, or to a public service commission. [Wayman v. Southard, 10 Wheat. 1; Minneapolis, St. P. & S. S. M. Ry. Co. v. Railroad Commission, 136 Wis. 146.]

IV. It is also settled beyond doubt or cavil that this power of prescribing maximum rates for common carriers, which as we have seen legislatures possess pursuant to an untramelled grant of the power to pass laws, may be delegated to a railroad commission or to a public

Delegation of Power.

service commission. To this rule, unless inhibited by express constitutional provision, there is not a reputable exception. These cases among many others which industry will uncover, so hold: State ex rel. Missouri Southern R. R. Co. v. Public Service Com., 259 Mo. 704; Chicago, B. & Q. R. R. Co. v. Jones, 149 Ill. 361; Kimbrell v. Louisville & Nashville Ry. Co., 67 So. 586; Intermountain Rate Cases, 234 U. S. 476; Louisville & Nashville Ry. Co. v. Interstate Commerce Com., 184 Fed. 118; Michigan Central R. R. Co. v. Railroad Com., 160 Mich. 355; Southern Indiana Ry. Co. v. Railroad Com., 172 Ind. 113; Atlantic Coast Line R. R. Co. v. North Carolina Corp. Com., 206 U. S. 1. c. 19; State ex rel. v. Missouri Pac. Ry. Co., 76 Kan. 467; Chicago & N. W. Ry. Co., v. Dey, 35 Fed. 866; Georgia Railroad v. Smith, 70 Ga. 694; Louisville & N. Ry. Co. v. Garrett, 231 U. S. 298; State ex rel. v. Chicago, M. & St. P. Ry. Co., 38 Minn. 281; State v. Railroad, 22 Neb. 313; State v. Atlantic Coast Line Ry. Co., 56 Fla. 617; Stone v. Wisconsin, 94 U. S. 181; Atlantic Express Co. v. Railroad, 111 N. C. 463; Railroad Comm. v. Atlantic Coast Line Rd., 71 S. C. 130; 4 R. C. L. 620; 8 Cyc. 834.]

Speaking of the now recognized universality of the above rule in all jurisdictions, Mr. Justice (now

Mr. Chief Justice) WHITE, in the case of Atlantic Coast Line Ry. Co. v. North Carolina Corporation Com., supra, at page 19, said:

"The elementary proposition that railroads from the public nature of the business by them carried on and the interest which the public have in their operation are subject, as to their State business, to State regulation, which may be exerted either · directly by the legislative authority or by administrative bodies endowed with power to that end, is not and could not be successfully· questioned in view of the ·long line of authorities sustaining that doctrine."

So again we say that he reads the cases in vain who does not concede· the authority of the Legislature, absent an express constitutional provision which forbids, to delegate to an administrative body the ·power to fix rates for the carriage of freight and passengers. In practice no more fair and feasible plan can be devised than to delegate this difficult and most technical duty to a board which is perpetually in session and furnished with skilled accountants and experts. The situation as to common carriers changes from year to year; sometimes even from month to month. A fixed, hard-and-fast rate made one year might be almost confiscatory next year; or conversely, the rate fixed might become far greater than the service rendered is worth. No legislature has the time, nor is it equipped with the machinery necessary to investigate matters of rate-making in any manner which will serve to prevent its enactment of laws fixing alleged "reasonable maximum rates" from being other than a mere guess. That often it may guess right, can not serve as an apology for the multitude of cases wherein its conceded good intentions may not save it from guessing wrong. In the very nature of things a right guess would be accidental. If the fixing of rates is to proceed intelligently along lines of fairness and justness to all concerned—to capital and labor, passenger and shipper—having due regard to

the constant mutations in the cost of labor and materials; to the differences in density of population and therefore in number of passengers and amount of freight; to cost of building and operation and maintenance of the roads in the more level and populous parts of the State as compared to similar over-head costs in the rough and mountainous and sparsely settled parts; to bringing about a condition which will encourage, or even permit, areas not now served, but needing service to be served by new roads yet to be built; and to periods of great commercial prosperity as compared to periods of commercial depression, it is manifest that the matter must be committed to some body having greater flexibility in procedure; having more time for investigation and having at hand more expert machinery to the end in view than any earthly Legislature possesses. Peculiarly are these general observations applicable to our own Legislature, which is limited by the Constitution to seventy-day sessions, and likewise in its authority to provide compensation to its employees. [Sec. 16, art. 4, Constitution 1875.]

V. There is left in the case the single question whether said section 47 is constitutional, upon the view taken by us In Banc of the effect of the passage of said section 47 upon formerly enacted reasonable maximum freight and passenger rates: That it repealed or suspended said rates as, and to the extent said by LAMM, C. J., in the case and excerpt above. Does it become upon our placing this construction on it unconstitutional for that it runs in the face of section 14 of article 12 of the Constitution?

Constitutionality of Delegating Statute.

Learned counsel for respondent strenuously insists that if it is to be construed as permitting the Commission in cases of deemed necessity, to raise any freight or passenger rate above the maximum rates fixed by the said acts of 1905 (as amended in 1907) and the act of 1907, then it can not stand.

This is the sole point left alive in the case. Approaching it, we concede that while examined from well-nigh every other angle by our former colleague Judge LAMM, he did not pass specifically upon the point of constitutionality. A bare reference to the reported case discloses this. We need not consider whether, as learned counsel for appellants urge, the learned jurist who wrote the Missouri Southern case had the constitutionality of this section in mind, or whether it was possible for him to rule the case as he did unless he antecedently, but *sub silentio*, determined in his own mind the identical constitutional question here involved. Therefore, while this question is whether said section 47 is a prohibited delegation of legislative power to an administrative body, and while Judge Lamm held that the power to determine reasonable maximum rates is, in the mode adopted therein, delegable to the Commission, yet that learned jurist did not specifically examine or consider this question of delegability in the light of the express provision of our Constitution. So, we will look at this point as a question of first impression.

Succinctly stated, LAMM, C. J., held, *inter alia,* in the Missouri Southern case, (a) that section 47 of the Public Service Commission Act is by broad implication a conditional repeal of older statutes fixing maximum railroad rates, and (b) that said section conferred authority upon the Commission to raise railroad rates conditionally, above the maximum fixed by the Legislature in such older statutes, if found necessary for that such rates were unreasonable, after a hearing upon the question; such hearing to be dominated by the incumbent statutory obligation to afford the carrier a reasonable average return upon the property actually employed by it in the public service. Upon such construction is section 47 unconstitutional? We think not. Construed as learned counsel for respondent contends, clearly it is not. For if it confers power to lower rates, but not to

raise them, no possible question of invalidity arising from said section 14 of article 12 of the Constitution could be for a moment maintained, however close such a point might come to the clause of the Federal Constitution forbidding the taking of property without due process of law and forbidding upon legal principles which are germane, the establishing by law of a rate which is confiscatory. Because, to travel afield for a moment, if power be given, as power is given by numerous other sections of this act, to compel the making of costly betterments of all sorts and kinds and no provision be made, or is, to be found in the act whereby revenue may be obtained to meet the cost of such enforced betterments, it is clear that there lacks but proof of the single fact of financial inability at the fixed rate, to render a statute conferring power to compel the making of betterments absolutely invalid, because confiscatory. [State ex rel. Missouri Southern R. R. Co. v. Public Service Com., supra.]

There are seven states having constitutions which contain provisions wholly similar, or similar in all material substance to the provisions of said section 14 of article 12 of our Constitution, which for comparison, we quote below: These states are Illinois. (Sec. 12 and 15, art. 11, Constitution 1870); West Virginia (Constitution 1872); Nebraska (Sec. 4, art. 11, Constitution 1875); Washington (Sec. 18, art. 12, Constitution 1899); Alabama (Sec. 243, Laws 1901); and Georgia (Sec. 2, art. 4, Constitution 1877). Our own provision upon this matter was taken from the Constitution of Illinois of 1870 (McGrew v. Railroad, 230 Mo. l. c. 518; Debates of Cons. Con. of 1875, p. 141), and it reads thus:

"Railways heretofore constructed, or that may hereafter be constructed in this State, are hereby declared public highways, and railroad companies common carriers. The General Assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and pas-

senger tariffs on the different railroads in this State, and shall from time to time pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on said railroads, and enforce all such laws by adequate penalties.'' [Sec. 14, art. 12, Constitution 1875.]

The provisions of the Illinois Constitution, from which, as said above, our own organic law on this subject was taken, ran thus:

''Railways heretofore constructed, or that may hereafter be constructed in this State, are hereby declared to be public highways, and shall be free to all persons for the transportation of their persons and property thereon, under such regulations as may be prescribed by law. And the General Assembly shall, from time to time pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on the different railroads in this State.

''The General Assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State, and enforce such laws by adequate penalties, to the extent, if necessary for that purpose, of forfeiture of their property and franchises.'' [Secs. 12 and 15, art. 11, Constitution of Illinois 1870.]

These express provisions, notwithstanding, it was held in the case of Chicago, Burlington & Quincy R. R. Co. v. Jones, 149 Ill. l. c. 376, upon the very point here confronting us that:

''It is claimed that the provision contained in said section 8 which authorizes the commissioners to fix for each of the railroads in the State a schedule of reasonable maximum rates is unconstitutional as being an attempted delegation of legislative power. The constitutional provisions on this subject are as follows: ' And the General Assembly shall, from time to time, pass laws establishing reasonable maximum

rates of charges for the transportation of passengers and freight on the different railroads in this State.' [Constitution, art. 11, sec. 12, 1 Starr & Cur. Stat., p. 163.] 'The General Assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State, and enforce such laws by adequate penalties to the extent, if necessary for that purpose, of forfeiture of their property and franchises.' [Constitution, art. 11, sec. 15, 1 Starr & Cur. Stat., p. 164.] The power to regulate and control the charges of railroad companies, or other agencies engaged in public employments, is legislative, and not judicial. Independently of such constitutional provisions as are above quoted, it is now the settled doctrine in this country that the legislatures of the states have the power to regulate and settle the freight and passenger charges of railroad companies, and the charges for services of other employments which are public in their character, subject only to such restraints as are imposed by charter contracts, and by the authority of Congress to regulate foreign and interstate commerce. [Munn v. Illinois, 94 U. S. 113; Chicago, B. & Q. R. R. Co. v. Iowa, 94 U. S. 155; Budd v. New York, 143 U. S. 517.] This doctrine is not here controverted. It is admitted that if, in the Act of 1873, the Legislature had prescribed, in definite and specific figures, reasonable maximum rates of charges, the law would have been valid. By an Act approved April 15, 1871, the Legislature of Illinois classified the railroads in the State into four classes, and provided that those in the first class should be limited to two and one-half cents per mile, those in the second to three cents per mile, those in the third to four cents per mile, and those in the fourth class to five and one-half cents per mile, as compensation for the transportation of any person with a certain amount of ordinary baggage. [Illinois Laws 1871, p. 640.] We held this law

to be valid. [Ruggles v. People, 91 Ill. 256.] The Supreme Court of the United States affirmed the decision. [Ruggles v. Illinois, 108 U. S. 526.]

"The objection made to the Act of 1873 is that it is not such an act as was the act of 1871, which was repealed on March 31, 1874. [2 Starr & Cur. Stat., p. 2368.] The Act of 1873 is said to be invalid because, instead of establishing reasonable maximum rates or charges, it is supposed to delegate the power to establish such rates to the railroad and warehouse commissioners. It has been held in a number of cases that statutes which create boards of commissioners, and authorize them to make schedules of rates for railroad companies, are not invalid for the reason here urged. The doctrine of these cases is that the functions of such boards are administrative, rather than legislative; that the authority conferred upon them relates merely to the execution of the law; that a grant of legislative power to do a certain thing carries with it the power to use all proper and necessary means to accomplish the end; and that, as the reasonableness of rates changes with circumstances, and legislatures cannot be continuously in session, the requirement that the statute itself shall fix the charges might preclude the Legislature from the use of the agencies necessary to perform the duty imposed upon it by the Constitution; in short that the Legislature may authorize others to do things which it might properly, but cannot conveniently or advantageously, do itself. [State v. Chicago, M. & St. Paul Ry. Co., 38 Minn. 281; Georgia R. R. Co. v. Smith, 70 Ga. 694; Tilley v. Savannah, F. & W. R. R. Co., 5 Fed. 641; Chicago & N. W. R. Co. v. Dey, 35 Fed. 866; State v. Fremont, E. & M. Valley R. R. Co., 22 Neb. 313, 23 Neb. 117; People v. Harper, 91 Ill. 357; 8 Am. and Eng. Ency. Law, page 911.] . . . We are therefore of the opinion that the act is not unconstitutional for the second reason urged upon our attention by counsel."

The constitutional provision of West Virginia upon this point reads thus:

"Railroads heretofore constructed or that may hereafter be constructed in this State, are hereby declared public highways and shall be free to all persons for the transportation of their persons and property thereon, under such regulations as shall be prescribed by law; and the Legislature shall, from time to time, pass laws, applicable to all railroad corporations in the State, establishing reasonable maximum rates of charges for the transportation of passengers and freights, and providing for the correction of abuses, the prevention of unjust discriminations between through and local or way freight and passenger tariffs and for the protection of the just rights of the public, and shall enforce such laws by adequate penalties." [Sec. 9, art. 11, Constitution 1872.]

Construing the above provision upon a similar sort of attack as is now before us, the Supreme Court of Appeals of West Virginia in the case of State ex rel. v. Baltimore & Ohio Ry. Co., 85 S. E. l. c. 716, said:

"This section is the same as originally adopted in the Constitution of 1872. By acts of the Legislature 1872-3, chapter 227, now contained in chapter 54, sec. 71a1, Code 1913, serial sections 2996, etc., the Legislature, in the exercise of this constitutional power, classified all railroads and undertook to establish reasonable maximum rates and charges for the transportation of passengers and freights, and to limit railroads thereby. The law as thus enacted remained undisturbed until the passage of chapter 41, Acts of 1907, limiting all railroads to two cents per mile, or fractional part of a mile, except railroads under fifty miles in length, and imposing penalties for violations of the statute, and repealing all acts or parts of acts inconsistent therewith. Thus the maximum rate of two cents per mile, instead of the rates fixed by Acts of 1872-3, was established.

"That the Legislature by these statutes undertook to comply with the mandate of the Constitution is manifest, and nowhere has it undertaken to delegate to any board or public service commission its legislative authority under the Constitution to establish reasonable maximum rates, or to promulgate and establish tariffs and rates for passengers or freights, to have general application to all railroads. Chapter 9 of the Acts of the Legislature of 1913 (Code 1913, c. 150, secs. 1-21 [Secs. 636-656]), establishing the Public Service Commission and prescribing its powers and duties, unless in the particulars pointed out by counsel for respondent, neither abrogates nor delegates legislative authority imposed by the Constitution, and is but the reasonable exercise by the Legislature, under said section of the Constitution, of its authority to regulate tariffs and rates and to provide 'for the correction of abuses, the prevention of unjust discriminations between through and local or way freight and passengers tariffs, and for the protection of the just rights of the public,' etc.

"Section 5, of that act, relied on by relator as warranting the relief sought, is as follows:

" 'The commission is hereby given the power to investigate all methods and practices of public service corporations, and to require them to conform to the laws of the State. The commission may compel obedience to its lawful orders by proceedings of mandamus or injunction or other proper proceedings in the name of the State in any circuit court having jurisdiction of the parties or of the subject-matter, or the Supreme Court of Appeals direct, and such proceedings shall have priority over all pending cases. The commission may change any intrastate rate, charge or toll which is unjust or unreasonable, and may prescribe such rate, charge or toll as would be just and reasonable, and change or prohibit any practice, device or method of service in order to prevent undue discrimination or favoritism as between

persons, localities or classes of freight; provided, that the commisison shall not reduce any rate, toll or charge within ten years after the completion of the railroad or plant to be used in the public service below a point which would prevent such public service corporation, person, persons or firm from making a net earning of eight per cent per annum on the cost of the construction and equipment of said railroad or plant. But in no case shall the rate, toll or charge be more than the service is reasonably worth, considering the cost thereof.

" 'Every order entered by the commission shall continue in force until the expiration of the time, if any, named by the commission in such order, or until revoked or modified by the commission, unless the same be suspended, modified or revoked by order or decree of a court of competent jurisdiction.'

"We fail to find in this section any delegation of legislative power, specifically imposed by the Constitution on the Legislature. Powers conferred by this act upon our Public Service Commission are similar in character to those conferred by Congress from time to time upon the Interstate Commerce Commission, and by many of the states upon commissions of like character, for the control and regulation of public service corporations."

Likewise it has been similarly held in the State of Washington, the Constitution of which is in the behalf here under discussion similar to ours. [State ex rel. Great Northern Ry. Co. v. Railroad Com., 52 Wash. 33; State ex rel. v. Superior Court of King County, 67 Wash. 37.] To show the only differences existing, we append the apposite provision of the Washington Constitution which thus reads:

"The Legislature shall pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight and to correct abuses and to prevent discrimination and extortion in the rates of freight and passenger tariffs on the dif-

ferent railroads and other common carriers in the State, and shall enforce such laws by adequate penalties. A railroad and transportation commission may be established and its powers and duties fully defined by law." [Sec. 18, art. 12, Constitution 1889.]

Considering whether the above quoted section of their constitution prohibited the Legislature from passing a valid law fixing a joint rate on wheat over the railroad of relator therein and another road, the Supreme Court of the State of Washington, in the case of State ex rel. v. Railroad Commission, 52 Wash. 1. c. 37, said:

"This whole question was discussed at length in Chicago, B. & Q. R. R. Co. v. Jones, 149 Ill. 361, 41 Am. St. 278, 24 L. R. A. 141. There the court decided, under a constitutional provision similar to ours, that a railroad and transportation commission could be established and its powers and duties defined by law. The reason given in many of the cases for the legislative establishment of a commission of this character is that rates established by a commission are more flexible than those established by the Legislature; that railroad rate conditions change rapidly and radically; and that rates established by one session of the Legislature, long before another session convened, might be oppressive, either to the carriers or to the shippers; and that, as long as the rates established by the commission were reasonable rates, which question might finally be determined judicially, there was no invasion of constitutional rights. From a reading of the Commission Act of 1907, it plainly appears to us that it was the intention of the Legislature that the act empowering the Commission to regulate rates worked a repeal of the rates established, or that the repeal would become effective upon the action of the Commission establishing rates which were in conflict with the rates theretofore established by the Legislature."

The applicable provisions of the Constitutions of Georgia and Alabama are in substance and meaning rescripts of each other, the Alabama provision upon' the subject having been adopted manifestly from the Constitution of Georgia. In substance, lacking the word "maximum" only, they differ in no material way from our own constitutional provision. The text of the Georgia pronouncement is as follows:

"The power and authority of regulating railroad freights and passenger tariffs, preventing unjust discriminations, and requiring reasonable and just rates of freight and passenger tariffs is hereby conferred upon the General Assembly, whose duty it shall be to pass laws from time to time to regulate freight and passenger tariffs, to prohibit unjust discriminations on the various railroads of this State, and to prohibit said roads from charging other than just and reasonable rates and enforce same by adequate penalties." [Par. 1, sec. 2, art. 4, Georgia Constitution 1877.]

It has been held, however, that this provision of the Constitution of the above states does not prohibit the delegation by the Legislature of power to investigate and fix reasonable maximum rates to a railroad commission. [Railroad Comm. v. Central of Georgia Ry. Co., 170 Fed. l. c. 237; Georgia Railroad v. Smith et al., Railroad Commrs., 70 Ga. l. c. 698; Tilley v. Savannah Ry. Co., 5 Fed. 641.] In each of the above cases the contention made was substantially that the provision of the respective constitutions of Georgia and Alabama imposed upon the Legislature itself the duty of establishing freight and passenger rates by express acts and that any delegation of this duty to a railroad commission was unconstitutional. Appositely, in passing upon the point, the Supreme Court of Georgia said in the case of Georgia Railroad v. Smith, supra, this:

"The act of October 14, 1879, provides that fair and reasonable rates only shall be charged by the railroads of the State. Did the constitutional con-

vention, by paragraph 1, section 2, article 4, intend more than the passage of a general law, such as this, to carry into effect the clause here referred to? It certainly was not contemplated that the details of rates to be fixed over the many miles of railway in the State, should be settled and determined by the Legislature. The many influences that combine to cause changes in the ever-varying vicissitudes of trade and travel were neither overlooked nor forgotten by that body. The utter impossibility of preparing by the Legislature just and proper schedules for the various railroads, with their differences of length, locality and business, appears to us to be so clear and manifest as that to have entertained it would have been absolutely absurd. And especially so, when it is remembered that schedules just and right, where arranged for the months of winter, might be ruinously unjust and wrong for the months of summer; or that such as were proper for the year of the meeting of the General Assembly might the succeeding year well nigh bankrupt every railroad corporation in the State. In our judgment, the act creating the Railroad Commission is not unconstitutional and void.''

In the Alabama case, supra (Railroad Comm. v. Central of Georgia Ry. Co., 170 Fed. 1. c. 238), it was said:

''The contention of the complainants is that, the Legislature having prescribed rates, or maximum rates, it could not by previous or subsequent statutes authorize the Railroad Commission to change them. It is not denied that the Legislature could confer on the commission the power to fix the rates, or that the Legislature could, if it chose, when practicable, fix them itself. The contention is that, when once fixed by Legislative enactment, power cannot be conferred on the Commission to change or repeal the law. . . . The Commission, from the time of its creation, had the power to reduce rates, and, when the Legislature fixed maximum or other rates, it knew of this power

of the Commission, and did not repeal it. We think the Legislature had the power to confer the authority in question on the Commission. [Saratoga Springs v. Saratoga Gas Co., 191 N. Y. 123, 83 N. E. 693.] Whether established directly by legislative action or by the Commission, the rates are always subject to the limitations of both the State and Federal constitutions. To hold that the Legislature could not confer on the Commission the power in question would either deprive the Legislature of the right to make rates by direct act, or deprive the Commission of the power to regulate them. This would not be sound, for, as a question of power, they may be regulated by either the Legislature or the Commission. . . . We do not think the statutes in question are void as conferring on the Commission legislative power in violation of the Alabama Constitution.''

After a diligent search we have not been able to find any case from any state having a constitutional provision similar to our own, which conflicts with those above cited, and quoted from, nor has the diligence of counsel furnished us any such from any of the states falling into this category. We have already seen that the rule is well-nigh universal that the fixing of rates may be delegated in all those states which have no such express constitutional provision, and which derive their legislative power to establish reasonable maximum rates from the general sovereign power to legislate on every subject of public welfare which is not specifically forbidden by their Constitutions. [Saratoga Springs v. Saratoga Gas Co., 18 L. R. A. (N. S.) 713, and cases cited, supra.]

Upon this point then both classes of cases, that is, (a) those arising in jurisdictions having express provisions like ours, and (b) those arising in jurisdictions having no such provisions, agree, that by reason of the inherent peculiarites and difficulties in the way of the sensible and reasonable administration by any other method, it is not forbidden delegation

of legislative power to clothe a public service commission with the power of establishing reasonable rates, maximum or minimum. However, it is self-evident that, since as we have plainly seen the Legislature of this State had and exercised the power to establish reasonable maximum rates of carriage for freight and passengers, long before section 14 of article 12 was ever written into our Constitution, the latter section of the Constitution was merely expressive of a theretofore existing constitutional power. Therefore, it follows that the above section adds nothing of either authority or inhibition (State ex rel. v. Railroad Comm., 52 Wash. l. c. 37), and so the cases which come from states having no express provision, as to the legislative authority over railroads, and which hold constitutional the delegation of this power, are just as cogent, binding and persuasive as cases from Illinois, West Virginia, Alabama, Washington and Georgia, which have constitutional provisions similar to our own, and which we cite specifically upon this point. We are constrained to conclude, therefore, that the courts of this Nation, seeing the absolute impracticability of any other sort of just supervision over rate-making, have with a unanimity that is remarkable agreed that the delegation of power is not forbidden by the organic law. On this point a learned writer has said:

"Nothing is more significant in the history of American institutions of late years than the spread of this movement. The concentration of the regulation of all the utilities which are public in character has become a policy to which all parties have given their support. During the past few years there has not been a time when the establishment of a public service commission, with general jurisdictions over all the utilities, has not been written in the annals of the legislation of several states. . . . The whole movement toward commission regulation rests upon the public conviction that the earlier methods of regula-

tion attempted through court processes has proved upon the whole ineffective, and that specific legislation has been in most instances unintelligent. As a practical matter the justification of the commission activity and supervision, as against statutory control enforced by the courts, is that there is thereby established a specialized body, expert in the particular work which it has to perform. The modern statutes establishing these bodies recognize the commission as the organ of the State both for protecting the rights of the utilities in the performance of their functions and for compelling the utilities to render in proper manner all of their public duties. Chief among the powers essential to such a commission is the right to obtain full information upon every point affecting the operatives of the companies subject to its jurisdiction. The power is generally given to the commissions in the states to determine and establish after notice and hearing just and reasonable rates and the classifications and regulations appertaining thereto.'' [Beale & Wyman on Railroad Rate Legislation (2 Ed.), secs. 64-66.]

Learned counsel for respondent urgently contends that the Legislature cannot delegate any power solemnly committed to it by the organic law. Upon this point the commendable industry of counsel has collated for us many authorities. These cases but announce the general and recognized rule that no one of the three co-ordinate branches of government may encroach upon the domain of another such branch, even with permission or by express invitation; in short, that the constitutional powers respectively committed to these branches are not delegable. The reason lies, it is probable, in the maxim that a power held by delegation may not be delegated. The sovereign people committed these powers to one co-ordinate branch; this branch cannot sell them, evade them, pass them on, or give them away to another. With these cases, therefore,

we have no quarrel; .they are however, in our view beside the point confronting us.

In ultimate effect the Legislature enacted that railroad rates should be reasonable, having due regard to the reciprocal rights of the public and the carrier, and empowered the Commission, upon a hearing, to ascertain what rates are prima-facie reasonable. This we think, the authorities conclusively hold it had the power to do. [State v. Atlantic Coast Line Ry. Co., 56 Fla. 617; Chicago, B. & Q. R. R. Co. v. Jones, 149 Ill. 361; Michigan Central R. R. Co. v. Michigan Railroad Com., 160 Mich. 355; Oregon R. R. & Nav. Co. v. Campbell, 173 Fed. 957; Chicago & N. W. R. Co. v. Dey, 35 Fed. 866; Morgan's Co. v. Railroad Com., 109 La. 247; State v. Great Northern Ry. Co., 100 Minn. 1. c. 477; State ex rel. v. Chicago, M. & St. P. Railroad, 38 Minn. 281.]

We concede that if the Legislature had by a statute said in effect to the Commission, "Fix reasonable maximum rates for freight and passengers upon the railroads of this State, and your action in this behalf, shall be, till either you or we revoke or repeal it by order or act, as conclusive as our own action would be if we were ourselves to fix such rates by statute," it is highly probable that this would constitute a forbidden delegation of power. But that is not what the Legislature did in passing said section 47. What it actually did was to authorize the Public Service Commission *"after a hearing had,"* and upon ascertaining *"that the maximum rates, fares or charges chargeable"* (i. e., capable of being charged) *"by any such common carrier . . . are insufficient,"* to *"determine"* (i. e., ascertain and render certain by the hearing had), *"with due regard, among other things to a reasonable average return upon the value of the property actually used in the public service,"* etc., *"the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum*

*to be charged for the service to be performed."* [Sec. 47, Public Service Commission Act.]   (Italics ours.)

From the very terms of this statute it will be observed that the Legislature has not delegated to the Commission the absolute power of fixing maximum rates, but alone the power to ascertain and determine what rates are reasonable (Field v. Clark, 143 U. S. 649), and by self-contained provisions in the act provided for a judicial review of the fact of reasonableness, which is only prima-facie, and while the commission may order the observance of these rates so found by it to be reasonable, under penalties for violation fixed by the Legislature (Sec. 63, Laws 1913, p. 599), such observance endures subject to a review by the courts.   The Legislature itself can fix a rate, without providing means in the act itself for a judicial review of the fact of reasonableness, but it could not delegate so thorough-going a power to the commission.   Nor has it done so here.   The fact of reasonableness as the commission is authorized to determine .it, is seen to be only prima-facie, for the courts may review the facts whereon the commission's conclusion of reasonableness is bottomed.   [Secs. 110 and 111, pp. 640 and 641, Laws 1913.]   In the sections last above it is provided that "any corporation or person or public utility interested" may apply for a rehearing "in respect to any matter determined" by the Commission (Sec. 110, supra), and if such rehearing be denied the applicant (for a rehearing) may obtain from the circuit court "a writ of *certiorari* or review for the purpose of having the reasonableness or lawfulness of the original order or decision . . . inquired into or determined." [Sec. 111, Laws 1913, p. 641.]   Examining the actual limits of the power conferred and drawing these distinctions which we think are deducible from the àct itself and fully warranted by the cases (C., B. & Q. R. R. Co. v. Jones, 149 Ill. 361; Chicago, M. & St. P. R. R. Co. v. Minnesota, 134 U. S. l. c. 462; Stone v. Farmers' Loan

& Trust Co., 116 U. S. 407; Chicago & N. W. R. Co. v. Dey, 35 Fed. 866; Budd v. New York, 143 U. S. 517; State ex rel. v. Chicago, M. & St. P. Ry. Co., 38 Minn. 281; Field v. Clark, supra; United States v. Grimaud, 220 U. S. 1. c. 520), we do not regard the authorities urged upon us by respondent as either applicable or controlling.

We conclude therefore that section 47 of the Public Service Commission Act is not for the reasons and authorities we have deemed it illuminating to set forth at so much length, so opposed to section 14 of article 12 of our Constitution as to be invalid, and that till the Legislature shall see fit to change the law by other enactments upon the subject-matter, the Public Service Commission may ascertain and establish reasonable maximum rates of carriage for intrastate freight and passengers upon the railroads of the State.

It follows that the case must be reversed and remanded to the circuit court with directions to affirm the order made herein by the Public Service Commission. Let this be done.

All concur except *Bond, J.*, who dissents as to paragraph 5 and result, and *Williams, J.*, who does not sit.

BOND, J. (dissenting).—Under the construction given section 47 of the Public Service Commission Act (Laws 1913, p. 583; Mo. Southern Ry. Co. v. Pub. Serv. Com., 259 Mo. 1. c. 728), I see no escape from the conclusion that said section was an attempted transfer by the Legislature of a specific duty expressly imposed upon it by the Constitution of the State. The pertinent portion of the Constitution of this State designating the Legislature as the organ of government to which is entrusted the power and duty of fixing a rate which may not be exceeded

Empowering Commission to Substitute Its Own Rates for Maximum Rates Established by Statute.

by railroads in charges made by them for passenger and freight service is, to-wit:

"The General Assembly . . . SHALL *from time to time pass laws* ESTABLISHING *reasonable maximum rates of charges* for the transportation of passengers and freight on said *railroads,* and enforce all such laws by adequate penalties." [Sec. 14, art. 12, Constitution 1875.]

This excerpt from our Constitution was taken bodily from a similar provision in the Constitution of Illinois. This provision was held in judgment by the Supreme Court of the sister state from which it was taken in the learned and accurate opinion by MAGRUDER, J. (C. B. & Q. Ry. Co. v. Jones, 149 Ill. 1. c. 381), wherein, after a full review of the case law, it was announced, to-wit:

"Under the constitutional provisions above quoted the Legislature of this State has the right, and it is ITS *prerogative,* if it chooses to exercise it, to pass a law ESTABLISHING or FIXING reasonable maximum rates of charges. When it passed the Act of 1873 [referring to one creating a board of railroad and warehouse commissioners] it did *not* choose to exercise the power thus conferred upon it. That act does *not establish* reasonable maximum rates, nor does it delegate to the board of railroad and warehouse commissioners the power to establish SUCH rates. When a board is authorized to make a schedule of rates, and their schedule is merely given the force and effect of prima-facie evidence as to the reasonableness of the rates in a suit involving the question of such reasonableness, there is no delegation to the board of the legislative power to establish rates. The Legislature thereby merely REFRAINS from the exercise of its constitutional power, and, by leaving the question as to the reasonableness of the rates open, makes room for the exercise by the courts of their jurisdiction upon the subject. . . . *But if it be conceded that making the schedule of the commission final and conclusive as to the rates is a dele-*

*gation of legislative power,* it is sufficient to say in the present case that the Act of 1873 does not give to the schedule any such final and conclusive effect. We are, therefore, of opinion that the act is not unconstitutional for the second reason urged upon our attention by counsel.'' [I. e. delegation of power.]    (Italics ours.)

The above quotation shows not only the radical difference between the case before the Illinois court and the one at bar, but also the true principle applicable to each. In the present case the State of Missouri DID exercise its ''prerogative'' to fix maximum freight and passenger rates. In the Illinois case the Legislature did *not,* at any time, exert its constitutional power and prerogative to establish and fix a reasonable *maximum rate* of charges. It wholly refused to do so, nor did it attempt to devolve that specific duty upon the Railroad and Warehouse Commission. It only gave that body the right to fix reasonable charges *which should be prima-facie evidence in suits against carriers,* and wholly subject to judicial review in such actions. Necessarily the creation of a board with such limited powers did not operate as a delegation to it of the particular power expressly devolved upon the Legislature of Illinois by the Constitution of that State, to-wit: ''To establish and fix reasonable maximum rates of charges.'' The Legislature of Illinois never parted with its exclusive power in that respect, and from the above summation of its views, it is evident that the learned Supreme Court of that State connoted this fact and made it the basis of its decision upholding the provisional and limited authority of the Board of Railroad and Warehouse Commissioners to make a schedule of charges which should have no force or effect even in suits against carriers, except as affording prima-facie evidence of a reasonable charge. All, therefore, that was decided in the Illinois case was, to use its language further: ''We do not, however, understand the Federal cases to hold that an act of a state legislature may not be valid, if *while omitting to* IT-

SELF *fix the maximum rates,* it creates a commission with authority to make schedules which shall be prima-facie evidence of the reasonableness of the rates." This enunciation of the law is incontrovertibly correct and shows by necessary implication that the validity of the appointment of such boards is made expressly to depend upon non-action by the State itself in the matter of exercising the power exclusively vested in it by its own constitution.

Applying this rule I hold that since the General Assembly of the State of Missouri *did* exercise its exclusive power to establish and fix maximum rates, it could not thereafter exercise it again except through the medium of its own power as a legislative body.

II. It cannot be necessary to do more than call attention to the language of the Constitution supra to prove that the power "to establish . . . maximum rates" is exclusively lodged in the General Assembly and that being expressly lodged in that department of the government, it is secure from invasion by all others. When the Constitution designates a particular donee of a power, only that functionary can exercise it and all others are necessarily excluded by the specification of one. These canons of constitutional construction are attested in all the decisions. Had our Constitution failed to point out and name the General Assembly as the particular governmental agency commanded "to establish . . . maximum rates" then the Legislature might have devolved that duty on some other than itself. For it is a truism that the Legislature may enact any law not expressly or impliedly prohibited by the State or Federal Constitution. But it can enact *none* which contravenes any provision of the State or Federal Constitution, both of which limit its powers to legislate. In the matter in hand our State Constitution says "the General Assembly shall . . . *establish* . . . maximum rates." There is no process of interpretation by which these words can be made to lose either

*Delegating Imposed Duty.*

the imperative force or specific designation intrinsic in their meaning. Hence, they limit the power to carry out the *command* to the body on which it is laid. In the face of these clear and controlling principles of constitutional construction can there be any reason why we should follow the rulings in the states of Arkansas, West Virginia, Alabama, Georgia, or Washington, founded on local constitutions not identical with the Constitution of this State, rather than the convincing decisions of the State of Illinois, whose constitution is identical, on this point, with ours?

The rulings of other states are not controlling with us, nor even persuasive when it is seen that either they do not touch the point under review, or else are lacking in logical exposition of fundamental principles. None of those cited bear on the single issue in this case; which is, whether a constitution which invests in *one body* the power and duty to do a specific act, is not violated when the delegated body attempts to substitute another agency for the performance of the act which the constitution provides shall only be performed by the body specified in its terms. The Constitution of Missouri having in clear terms selected and appointed one agent for this particular task, the Legislature is powerless to disregard that constitutional provision by substituting another. *This is the whole question presented in this case.* Hence it is quite off the point to refer to the familiar rule that unless restricted by the Constitution the General Assembly has plenary power to legislate, in the pursuance of which it may commit it to inferior bodies—such as public service commissions—the finding of reasonable rates to be charged by carriers, subject to review by the courts. That is a well recognized rule, but can have no application, in a case like the present, where the Constitution has declared that the making of top or maximum rates "SHALL" be done by the Legislature itself.

III. The maximum rates established by the laws passed by the General Assembly under the mandate of

the Constitution, have been sustained by the Supreme Court of the United States. [Missouri Rate Cases, 230 U. S. 474.] The later acts of the Legislature devolving its constitutional duty on the Public Service Commission being in violation of the organic law, as far as it undertook to give the Commission a right by its order to create *higher* rates of charge than those established by the legislature itself, the question arises what is the remedy which the carriers are entitled to invoke? Necessarily only through a new or amended constitution. For the impediment to relief through the fixing of "maximum rates" by an administrative board is the restriction contained in our Constitution of 1875. That instrument has been unchanged for nearly fifty years has become an anachronism as applied to the changed conditions wrought by the lapse of half a century of business development, and should be succeeded by a new constitution, adapted to the present demands of the vast and varied industries of the State and the needs of its people, and which should annul the restrictions in this respect imposed on the General Assembly by the language of the present Constitution.

*Higher Rates.*

*New Constitution.*

Being unable to find any constitutional warrant for the theory that the order of the Public Service Commission could, in any event, conditionally or otherwise, repeal the existing State statutes now regulating charges of carriers, I am constrained to dissent from the discussion and conclusion of the learned majority opinion.